RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0438P (6th Cir.)
File Name: 03a0438p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PLEASANTVIEW NURSING
HOME, INC.,
　　　　　*Petitioner/*
　　　*Cross-Respondent,*

　　*v.*

NATIONAL LABOR RELATIONS
BOARD,
　　　　　*Respondent/*
　　　*Cross-Petitioner,*

TEXTILE PROCESSORS,
SERVICE TRADES, HEALTH
CARE, PROFESSIONAL AND
TECHNICAL EMPLOYEES'
UNION, LOCAL NO. 1,
　　　　　*Intervenor.*

Nos. 01-2288/2533

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board.
No. 8-CA-28519.

Argued: March 25, 2003

Decided and Filed: December 10, 2003

---

Before: BOGGS, Chief Judge; SILER, Circuit Judge; and
STEEH, District Judge.[*]

---

## COUNSEL

**ARGUED:** Maynard A. Buck, BENESCH, FRIEDLANDER, COPLAN & ARONOFF, Cleveland, Ohio, for Petitioner. Sharon I. Block, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. **ON BRIEF:** Maynard A. Buck, Ann E. Knuth, BENESCH, FRIEDLANDER, COPLAN & ARONOFF, Cleveland, Ohio, for Petitioner. Sharon I. Block, Aileen A. Armstrong, Bridget O'Connor, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

---

## OPINION

---

BOGGS, Chief Judge. Petitioner Pleasantview Nursing Home, Inc. ("Pleasantview"), operated a nursing home organized by the Textile Processors, Service Trades, Health Care, Professional and Technological Employees International Union, Local No. 1 ("Union"). After the 1996 negotiations between Pleasantview and the Union for a new collective bargaining agreement ("CBA") broke down, Pleasantview declared an impasse and unilaterally imposed its final offer. The National Labor Relations Board ("NLRB"), acting on a Union charge, found Pleasantview to have engaged in a series of unfair labor practices in violation of the National Labor Relations Act ("NLRA"): breach of the

---

[*] The Honorable George C. Steeh, United States District Judge for the Eastern District of Michigan, sitting by designation.

requirement in previous CBAs to remit Union initiation fees; a unilateral increase in wages of some employees during the final negotiations; refusal to negotiate holiday and pension buy-backs in good faith; insistence to an impasse on a change in the initiation fee provision; and unilateral implementation of Pleasantview's final offer without a valid impasse. Pleasantview petitions this court for review and the NLRB cross-petitions for enforcement of its order to remedy these alleged unfair labor practices. We enforce the order in part and grant the petition for review in part.

## I

Pleasantview operates a nursing home on the west side of Cleveland. In 1984, the Union was certified as the collective bargaining representative of Pleasantview's orderlies and other aides. The initial CBA between Pleasantview and the Union went into effect in June 1985. This and all subsequent CBAs contained a union-shop provision requiring all employees covered by the CBA to join the Union and a collection clause requiring Pleasantview to collect the Union's initiation fees from the employees' pay each month. Moreover, all CBAs contained a zipper clause stating that no amendment is effective unless executed in writing by both parties. Nevertheless, Pleasantview and the Union reached an informal understanding not to enforce the collection clause because doing so would place Pleasantview, at the time the only organized nursing home in the area, at a competitive disadvantage. This informal understanding was observed for ten years until, in June 1995, the Union notified Pleasantview that it had organized another area nursing home, Alpha Health Center ("Alpha"). At this point, Pleasantview began collecting the initiation fees for new hires. However, when Pleasantview learned that while Alpha had indeed been organized, there was no CBA requiring Alpha to collect initiation fees, and there would be no such CBA for the foreseeable future, Pleasantview once again ceased collecting the initiation fees and refunded those initiation fees still in Pleasantview's possession.

On April 25, 1996, the Union and Pleasantview began negotiations for a new CBA covering the seventy-eight employees represented by the Union. As Pleasantview was facing a serious labor shortage, one of its aims in these negotiations was to provide for a significant increase in the pay of the represented employees. Pleasantview's initial proposal was to increase hourly wages and to finance this increase partially by the elimination of three paid holidays and the company contribution to Union-managed pension and disability funds. In return, employees would receive access to employer-sponsored investment and insurance plans. Pleasantview also wished to be freed, explicitly, of its obligation to collect initiation fees until another area nursing home was required to do so. Alternatively, Pleasantview offered to collect the initiation fees but only if the union-shop clause was replaced by a maintenance-of-membership clause requiring current members to remain in the Union but giving new hires the option not to join. On May 31, the last written CBA expired, but Pleasantview and the Union orally agreed to extend the CBA while negotiations continued and to apply the new CBA, when agreed to, retroactively to this date. Subsequently, Pleasantview informed the Union that, because of the labor shortage, it was going to increase pay unilaterally for new hires while negotiations were proceeding. According to Pleasantview, the Union negotiator nodded in response. On July 6, Pleasantview did increase the starting hourly wage for new employees and recently hired employees whose wages were still below the new starting wage. This change affected six employees.

On September 17, after twelve negotiation sessions, Pleasantview, at the suggestion of a federal mediator involved in the negotiations, made a final offer to the Union incorporating the changes to the CBA that Pleasantview sought. The Union rejected this offer and declined to present

it to the Union membership for a vote. At this point, Pleasantview declared an impasse and stated its intention to implement its final offer unilaterally on September 22. In response, the Union called a strike for that date and filed an unfair labor practices charge with the NLRB. On September 19, Pleasantview wrote a letter to its represented employees explaining that it would implement its final offer and informing employees that, should they not wish to participate in the strike, they could avoid union fines by withdrawing from the Union. On September 22, the Union struck and began picketing Pleasantview. However, a large majority of represented Pleasantview employees chose to cross the picket line that consisted of three Pleasantview employees and several Union officials. The strike collapsed after one shift. By the time the strike collapsed, more than three-quarters of Pleasantview's represented employees had informed Pleasantview of their withdrawal from the Union.

On April 30, 1997, the General Counsel of the NLRB, acting on the Union's charge, filed an unfair labor practices complaint against Pleasantview. On March 20, 1998, an NLRB Administrative Law Judge ("ALJ") concluded that Pleasantview had violated the NLRA by refusing to remit the initiation fees to the Union, unilaterally raising the wages of new and recently hired employees during the course of negotiations, and by implementing its last offer without reaching a valid impasse. Pleasantview and the general counsel appealed to a three-judge panel of the NLRB. On August 27, 2001, this panel, over a partial dissent of the chairman of the NLRB, concluded that Pleasantview had violated the NLRA in the manner cited by the ALJ and also by insisting to impasse on the elimination of the initiation fees and by refusing to negotiate in good faith with respect to the buy-back of the pension and paid holiday provisions. 335 N.L.R.B. No. 77. The NLRB ordered Pleasantview to cease and desist from these practices, to rescind the imposition of its final offer, to make employees whole, and to reopen bargaining with the Union. Before this court now are

Pleasantview's petition for review of the NLRB's order and the NLRB's cross-application for enforcement.

## II

The NLRB has jurisdiction to prevent unfair labor practices. NLRA § 10(a), 29 U.S.C. § 160(a). This court has jurisdiction over petitions to review or enforce orders issued by the NLRB. NLRA § 10(e), 29 U.S.C. § 160(e). "We review the [NLRB's] conclusions of law *de novo* . . . If the [NLRB] errs in determining the proper legal standard, we may refuse enforcement on the grounds that the order has no reasonable basis in law." *NLRB v. Good Shepherd Home*, 145 F.3d 814, 816 (6th Cir. 1998) (quoting *NLRB v. Pentre Elec.*, 998 F.2d 363, 368 (6th Cir. 1993)). We review the NLRB's factual findings under a deferential standard. "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." NLRA § 10(e), 29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 493 (1951); *NLRB v. St. Francis Healthcare Ctr.*, 212 F.3d 945, 951-52 (6th Cir. 2000). "Evidence is substantial when it is adequate, in a reasonable mind, to uphold the [NLRB's] decision." *St. Francis*, 212 F.3d at 952. (Internal quotation omitted). However, even when reviewing factual questions, we will not serve "as a mere rubber stamp for the administrative agency." *NLRB v. Cook Family Foods*, 47 F.3d 809, 816 (6th Cir. 1995) (quoting *YHA, Inc. v. NLRB*, 2 F.3d 168, 172 (6th Cir. 1993)).

The NLRA protects the right of workers to unionize and bargain collectively. "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing." NLRA § 7, 29 U.S.C. § 157. "[F]or an employer . . . to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" § 7 of the NLRA is an unfair labor practice. NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1).

So is "refus[al] to bargain collectively with the representatives of his employees." NLRA § 8(a)(5), 29 U.S.C § 158(a)(5).

> [T]o bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession.

NLRA § 8(d), 29 U.S.C. § 158(d). Outside some limited circumstances, "the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract." NLRA § 8(d), 29 U.S.C. § 158(d).

The NLRB here alleges five instances of unfair labor practices on the part of Pleasantview: the failure to collect and remit initiation fees; the unilateral increase of starting wages during the contract negotiations; the failure to negotiate with respect to the buy-back of the pension and paid holiday provisions; the insistence to impasse regarding the collection of initiation fees; and the implementation of the final offer without existence of a valid impasse. We review these issues in the same order.

### A

The first unfair labor practice alleged is Pleasantview's failure to collect union initiation fees as required by all CBAs

in effect from June 1985 through May 1996.[1] "It is well established that the duty to bargain includes a duty to check off and remit union dues if there is a contractual basis for doing so." *Cherry Hill Textiles*, 309 N.L.R.B. 268, 269 (1992). A failure to do so is a violation of § 8(a)(5). *Ibid.* Therefore Pleasantview violated § 8(a)(5) in failing to collect the fees.

To counter this conclusion, Pleasantview points to the consistent practice of the Union not to insist on collection of the fees throughout most of its representation and of Pleasantview not to do so. The basis for this practice appears to have been an oral agreement between the Union and Pleasantview not to enforce the collection clause until another area nursing home either, according to the Union, was organized by the Union or, according to Pleasantview, actually began remitting union initiation fees. The sole written record of this agreement was a letter from Pleasantview to the Union stating that the collection clause would be inoperative for the period covered by the initial CBA. The NLRB generally frowns on oral modification of written CBAs. *See Beech & Rich*, 300 N.L.R.B. 882, 882 (1990) (refusing to give effect to an alleged oral agreement that "would not merely explain or clarify the parties' intent

---

[1] While Pleasantview never collected union initiation fees, except briefly in 1995, the Union only sought collection for the six-month period preceding its filing of the unfair labor practices charge, starting on March 17, 1996. *See* NLRA § 10(b), 29 U.S.C. § 160(b) ("[N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board."). Pleasantview contends whatever contractual duty to collect the fees existed expired with the final written CBA on May 31. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 199 (1991) (citing NLRA § 302(c)(4), 29 U.S.C. § 186(c)(4)). However, during the course of the negotiations until Pleasantview implemented its final offer on September 22, the parties were operating under an oral extension of the final written CBA. Therefore we here address the period from March 17 through September 22.

regarding provisions of the collective-bargaining agreement but would instead invalidate and nullify the written agreement."); *NDK Corp.*, 278 N.L.R.B. 1035, 1035 (1986) ("National labor policy requires that evidence of oral agreements be unavailing to vary the provisions of a written collective-bargaining agreement valid on its face."); *but see Certified Corp. v. Haw. Teamsters & Allied Workers, Local 996*, 597 F.2d 1269, 1270 (9th Cir. 1979) (holding that "a written collective bargaining agreement can be orally modified"). However, we need not decide whether oral modification in general is impermissible because all CBAs here contained an express zipper clause prohibiting modification except by written agreement executed by both parties. Such zipper clauses are legally effective. *See Martinsville Nylon Employees Council Corp. v. NLRB*, 969 F.2d 1263, 1267-68 (D.C. Cir. 1992); *cf. St. Vincent's Hospital*, 320 N.L.R.B. at 44 (giving effect to oral modification of CBA where zipper clause did not require modifications to be in writing).[2] Because neither an oral agreement, nor an unsigned letter that by its own terms only

covers the initial CBA, constitutes a valid modification of the final CBA at issue here, its unambiguous language controls.[3]

Pleasantview also argues that the NLRB overstepped its authority in attempting to enforce the collection clause. "The Board is not the proper forum for parties seeking to remedy an alleged breach of contract or to obtain specific enforcement of its terms." *United Tel. Co. of the W.*, 112 N.L.R.B. 779, 782 (1955) (citing *Ass'n of Westinghouse Salaried Employees v. Westinghouse Elec. Corp.*, 348 U.S. 437, 444 n.2 (1955)). Pleasantview's general point is well-taken; precedent is clear that courts, not the NLRB, are the proper forum for enforcement of contracts, including CBAs. In general "a mere breach of the contract is not in itself an unfair labor practice," and hence not within the jurisdiction of the NLRB. *NCR Corp.*, 271 N.L.R.B. 1212, 1213 n.6 (1984); *see also NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 427 (1967) ("Congress determined that the Board should not have general jurisdiction over all alleged violations of collective bargaining agreements."). However, precedent is equally clear that the breach of one particular type of CBA clause, remittal of union dues, *is* an unfair labor practice. *Cherry Hill Textiles*, 309 N.L.R.B. at 269. Collection of union fees is so intricately connected to the right to bargain collectively protected by the NLRB under NLRA § 8(a)(5) that it does fall within its jurisdiction. *United Tel. Co.* and *NCR Corp.* are not

---

[2]In *Certified Corp.*, the Ninth Circuit also considered the question whether an oral modification of a written CBA was legally effective in the face of a zipper clause similar to the one at issue here. That court, relying on the common-law principle that oral modification is always permissible, a zipper clause notwithstanding, concluded that it was. *Certified Corp.*, 597 F.2d at 1271. The District of Columbia Circuit rejected this conclusion, relying on the UCC principle that gives effect to zipper clauses. *Martinsville Nylon Employees*, 969 F.2d at 1268. We agree with the District of Columbia Circuit both because it represents the better policy and because the statement in *Certified Corp.* was mere dicta. While *Certified Corp.* refers to an "oral modification," the oral agreement there was in fact a new agreement replacing the original written agreement which at the time had already expired, mooting its zipper clause.

[3]A separate issue arises with respect to the period from May 31, when the final written CBA expired, through September 22, when Pleasantview implemented its final offer. During this period, the parties were operating under an oral extension of the final written CBA. Because an oral agreement that cannot be modified except in writing would at least be a curiosity, arguably this oral extension implicitly expunged the final written CBA's zipper clause. Hence, during this period, the parties may have been able to suspend the collection clause by oral agreement. However, there is no evidence that they did so during this period and the Union, which by then had begun to press for enforcement of the collection clause, would have been unlikely to agree to its suspension.

to the contrary as both concerned not the collection of union fees but the interpretation of clauses regulating the length of the work week and limiting employee transfers, respectively. Such substantive issues not directly involving union representation were properly adjudicated in the courts. Thus, the Board did not err in finding an unfair labor practice.

**B**

The second unfair labor practice alleged is Pleasantview's unilateral increase of starting wages during the 1996 contract negotiations. While the final written CBA had expired at the time of the wage increases, the parties were operating under an oral extension of that CBA when Pleasantview implemented this wage increase. "The Board has taken the position that it is difficult to bargain if, during negotiations, an employer is free to alter the very terms and conditions that are the subject of those negotiations." *Litton Fin.*, 501 U.S. at 198. "If an employer changes wages or other terms without affording the Union an opportunity for adequate consultation, it 'minimizes the influence of organized bargaining' and emphasizes to the employees 'that there is no necessity for a collective bargaining agent.'" *Loral Def. Sys. v. NLRB*, 200 F.3d 436, 449 (6th Cir. 1999) (quoting *May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 385 (1945)). Therefore, "an employer's unilateral change in conditions of employment under negotiation is . . . a violation of § 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal" to negotiate. *NLRB v. Katz*, 369 U.S. 736, 743 (1962); *accord Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 544 n.6 (1988), *aff'g* 779 F.2d 497 (9th Cir. 1985); *NLRB v. Talsol Corp.*, 155 F.3d 785, 794 (6th Cir. 1984). "[A]n employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment." *Litton Fin.*, 501 U.S. at 198 (citing *Katz*). In this case, Pleasantview unilaterally increased the wages of

some employees during the negotiations with the Union covering that very subject. Even though this unilateral change only affected a handful of current employees and new hires, it was an unfair labor practice.

Pleasantview contends that these wage increases were compelled by economic exigency and hence were exempted from the rule against unilateral imposition of changes during labor negotiations. "When economic exigencies compel prompt action," employers are authorized to make such changes even during negotiations. *Bottom Line Enters.*, 302 N.L.R.B. 373, 374 & n.11 (1991) (citing *Winn-Dixie Stores*, 243 N.L.R.B. 972, 974 & n.9 (1979)). An employer attempting to prove economic exigency must carry a "heavy burden." *Our Lady of Lourdes Health Ctr.*, 306 N.L.R.B. 337, 340 n.6 (1992). Economic exigency requires a "compelling business justification." *Winn-Dixie Stores*, 243 N.L.R.B. at 976 n.9. A mere "business necessity is not the equivalent of compelling considerations which excuse bargaining." *Hankins Lumber Co.*, 316 N.L.R.B. 837, 838 (1995). For example, "loss of an account representing 14 percent of revenue" is not an economic exigency. *Angelica Healthcare Servs.*, 284 N.L.R.B. 844, 853 (1987). "[O]perating at a competitive disadvantage does not necessarily equate to an economic emergency." *Triple A Fire Protection, Inc.*, 315 N.L.R.B. 409, 414-15 (1994). "Nor does inconvenience to the employer fall into that category." *Farina Corp.*, 310 N.L.R.B. 318, 321 (1993) (citing *Clements Wire Co.*, 257 N.L.R.B. 1058 (1981)). "[A]n underlying reason for not requiring bargaining when there are 'compelling economic considerations' is that an unforeseen occurrence, having a major economic effect, is about to take place that requires the company to take immediate action." *Angelica*, 284 N.L.R.B. at 853. "Consistent with the requirement that an employer prove that its proposed changes were 'compelled,' the employer must additionally demonstrate that the exigency was caused by external events, was beyond the employer's control, or was not reasonably

foreseeable." *RBE Elecs. of S.D., Inc.*, 320 N.L.R.B. 80, 82 (1995) (footnotes and citations omitted). "[B]ecause the exception is limited only to those exigencies in which time is of the essence and which demand prompt action, we will require an employer to show a need that the particular action proposed be implemented promptly." *Ibid.* (footnote and citations omitted).

Under this standard, the NLRB's finding that Pleasantview did not face an economic exigency was supported by substantial evidence and hence must be upheld. Undoubtedly, Pleasantview faced intense labor market pressure to increase wages. Its eagerness to do so, rare in any rational employer not under such pressure, attests to that. However, Pleasantview does not demonstrate that this pressure had reached emergency levels. Rather, Pleasantview admits to having suffered this chronic problem since 1985. Pleasantview does not claim that it faced an immediate risk of staff levels so low as to force it to shut down. *Cf. Tylertown Wood Prods.*, 251 N.L.R.B. 515, 521 (1980) (an equipment failure making an entire plant inoperable is an exigency excusing unilateral layoffs). A business's inability to acquire the desired quantity of an input, here labor, at a given price is not an economic exigency. *See Hankins*, 316 N.L.R.B. at 838 (a supply shortage "does not fall within this narrow exception to the general duty to bargain."). The conclusion that Pleasantview did not face an economic exigency is supported by the two-month delay between the time it first requested the wage increase and the time it implemented it. *See Our Lady of Lourdes*, 306 N.L.R.B. at 337 n.1.[4]

---

[4] A delay between the time a threatening condition comes to the employer's attention and the time the employer takes steps to counter it is of course not dispositive of the question whether the condition constitutes an emergency. Clearly some genuine emergencies can be anticipated well in advance.

Pleasantview also argues that it was entitled to increase the wages, even in the absence of economic exigency, because the Union either consented to the increases or waived the right to negotiate the issue. The basis for the contention that the Union consented is the testimony of Pleasantview's negotiator that the Union negotiator nodded when Pleasantview proposed an increase in starting wages and did not strenuously object when informed after the fact that Pleasantview had increased the wages. Union witnesses denied that they had consented to the wage increase. The ALJ, after hearing testimony from both sides, chose to credit the Union witnesses over the Pleasantview witnesses and the NLRB adopted this finding. As "credibility determinations must be accepted unless it is clear that there is no rational basis for them," we too uphold this finding. *Health Care & Retirement Corp. v. NLRB*, 255 F.3d 276, 282 (6th Cir. 2000) (quoting *NLRB v. Valley Plaza, Inc.*, 715 F.2d 237, 242 (6th Cir. 1983)).

On the same evidence, Pleasantview asserts that the Union waived its right to negotiate regarding the wage increases. An apparent tension exists in the case law regarding what actions constitute a waiver. While the Supreme Court has stated that "the waiver must be clear and unmistakable," *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983), the NLRB has held that "a union which receives timely notice of a change in conditions of employment must take advantage of that notice if it is to preserve its bargaining rights and not be content in merely protesting an employer's contemplated action," *Clarkwood Corp.*, 233 N.L.R.B. 1172, 1172 (1977) (citing *Am. Buslines*, 164 N.L.R.B. 1055 (1967)). This discrepancy is resolved by the difference in context: *Metropolitan Edison* considers an alleged waiver arising out of a negotiated contract; *Clarkwood Corp.* considers the waiver of a union's right to negotiate a minor change in the terms and conditions of employment occurring outside of negotiations. In a negotiation, a party need not respond to every statement with a forceful rejection and insistence on further bargaining;

further bargaining is assumed and a waiver of the issue will not be presumed unless it is clear and unmistakable. Conversely, outside of negotiations, an employer can reasonably conclude that any minor change it makes will be acceptable unless the Union makes its desire to negotiate the issue clear. In our case, the alleged waiver occurred during negotiations and consisted of the Union not forcefully rejecting the wage increase. This was not the required clear and unmistakable waiver. Therefore, the Board was correct in finding an unfair labor practice.

### C

The third unfair labor practice alleged was Pleasantview's failure to negotiate with respect to its proposal for the buy-back of pension and paid holiday provisions. The NLRA imposes on unionized employers a duty to bargain collectively. NLRA § 8(a)(5), 29 U.S.C § 158(a)(5). This mutual obligation to bargain collectively is confined to good faith discussions "with respect to wages, hours, and other terms and conditions of employment." NLRA § 8(d), 29 U.S.C. §158(d). Parties are obligated to negotiate on these so-called mandatory subjects "and within that area neither party is legally obligated to yield." *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 210 (1964) (citing *NLRB v. Am. (Nat.) Ins. Co.*, 343 U.S. 395 (1952)). Fringe benefits, such as paid holidays and pensions, "clearly fall within the compass of 'wages,' and are therefore subjects over which employers and employees must bargain." *Amalgamated Transit Union Int'l v. Donovan*, 767 F.2d 939, 951 & n.12 (D.C. Cir. 1985) (citing *Singer Mfg. Co. v. NLRB*, 119 F.2d 131 (7th Cir. 1941) (paid holidays) and *Detroit Police Officers Ass'n v. City of Detroit*, 214 N.W. 2d 803 (1974) (pensions)).

Here, the NLRB alleges that Pleasantview failed to bargain in good faith with respect to the holiday buy-back and pension changes. It bases this conclusion on three facts: that

Pleasantview did not alter its initial bargaining position with respect to these issues; that during one negotiation session Pleasantview's negotiator stated that its position regarding holiday and pension buy-backs was non-negotiable; and that Pleasantview unilaterally implemented the wage increase, which it ultimately wished to finance by the holiday and pension buy-back, for a handful of employees while negotiations were still ongoing. We agree with the ALJ and chairman of the NLRB, not the majority of the NLRB panel, that these facts, separately or in combination, were insufficient to allow the NLRB to conclude that Pleasantview refused to negotiate these issues in good faith.

Pleasantview's ultimate refusal to change its position regarding the buy-backs does not constitute bad faith. "Good faith bargaining is all that is required. That the position of one party on an issue prevails unchanged does not mandate the conclusion that there was no collective bargaining over the issue." *McCourt v. Cal. Sports, Inc.*, 600 F.2d 1193, 1200 (6th Cir. 1979) (citing *Am. (Nat.) Ins. Co.*, 343 U.S. at 404). The 1947 "amendment [to the NLRA] makes it clear that the failure to reach an agreement because of the employer's refusal to make a concession to the Union does not, by itself, constitute lack of good faith." *NLRB v. United Clay Mines Corp.*, 219 F.2d 120, 125 (6th Cir. 1955). Where "[t]he failure to execute a contract was not because of a failure or refusal to negotiate, but in the final analysis was because the parties would not agree on one remaining issue, considered by both of them as basically important," no bad faith has been evinced. *Ibid.* "To say that the Company should have accepted the Union's proposal on this issue is to ignore the language of the statute that the obligation to bargain collectively 'does not compel either party to agree to a proposal or require the making of a concession.'" *Id.* at 125-26; *accord McCourt*, 600 F.2d at 1201. Pleasantview's insistence on the buy-backs constituted no more than hard bargaining. "[H]ard bargaining, the kind countenanced by the NLRA as an inevitable aspect of labor-management relations"

is "not unfair bargaining." *NLRB v. Gibraltar Indus.*, 653 F.2d 1091, 1096 (6th Cir. 1981) (citing *McCourt*, 600 F.2d at 1200, and *Fetzer Television v. NLRB*, 317 F.2d 420, 424 (6th Cir. 1963)).

The NLRB's most serious factual ground for finding bad faith was the statement by Pleasantview's negotiator during the July 25 session that the buy-backs were "non-negotiable." If this statement had reflected Pleasantview's actual stance regarding this mandatory bargaining subject, it would undisputably have been sufficient to support a finding of bad faith. "[I]f a party is so adamant concerning its own initial positions on a number of significant mandatory subjects, we may properly find bad faith evinced by its 'take-it-or-leave-it' approach to bargaining." *88 Transit Lines*, 300 N.L.R.B. 177, 178 (1990) (citing *NLRB v. Gen. Elec. Co.*, 418 F.2d 736, 756-57 (2d Cir. 1969)). However, to determine the existence of bad faith, we look to bargaining conduct, not bargaining rhetoric. Pleasantview's conduct both before and after the July 25 session indicates that the "non-negotiable" statement was mere rhetoric and not an accurate reflection of Pleasantview's stance. Negotiations continued for almost two months after July 25. Pleasantview's statement that it "just couldn't come up with a different plan to get the fifty cents" wage increase, cited by the NLRB as further evidence of bad faith, in fact indicates the opposite. It conveys a willingness to listen to alternative ways of reaching agreement. *Cf. United Clay Mines Corp.*, 219 F.2d at 125 (citing *NLRB v. Jacobs Mfg. Co.*, 196 F.2d 680 (2d Cir. 1952), for the proposition that "[l]ack of good faith may be found from a refusal to discuss certain subjects."). That ultimately neither the Union nor Pleasantview was able to "come up with a different plan" acceptable to both is evidence of impasse, not bad faith. Where the overall bargaining conduct indicates good faith and willingness to negotiate, a stray statement indicating inflexibility will not overcome the general tenor of good faith negotiation. *See Indus. Elec. Reels*, 310 N.L.R.B. 1069, 1069, 1072 (1993).

Finally, Pleasantview's implementation of the increase in starting wages, while an unfair labor practice, is not relevant to the issue of whether Pleasantview negotiated in good faith regarding the holiday and pension buy-backs. Initially, we note that this increase affected less than ten percent of the represented employees. For more than ninety percent of the employees, the final pay scale still rested with the outcome of ongoing negotiations. More significant, while Pleasantview's overall negotiation stance was that the buy-backs were necessary to fund the wage increases, Pleasantview *only implemented the wage increase* portion of this offer during the negotiations. The buy-backs were entirely unaffected by this unilateral action. Hence, Pleasantview's unilateral action had only the most peripheral relationship to the buy-back negotiations. The Board erred in finding this to be an unfair labor practice.

**D**

The fourth unfair labor practice alleged was Pleasantview's insistence to the point of impasse regarding the collection of initiation fees. "[I]nternal affairs of labor organizations are not 'an aspect of the relationship between the employer and the employees,' but rather, by statutory definition are encompassed by the relationship between labor organizations and employees. It follows that subjects embraced by the internal affairs proviso are not mandatory ones." *Serv. Employees, Local 535*, 287 N.L.R.B. 1223, 1225-26 (1988) (quoting *Allied Chem. Workers, Local 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 178 (1971)), *enforced sub nom. N. Bay Dev. Disabilities Servs. v. NLRB*, 905 F.2d 476 (D.C. Cir. 1990). "One subject specifically regarded by Congress as an internal affair of labor organizations is that of the amount of fees established and assessed on employees." *Serv. Employees*, 287 N.L.R.B. at 1226; *accord N. Bay Dev. Disabilities Servs.*, 905 F.2d at 478. Hence the collection clause was not a mandatory subject of bargaining. *Ibid.* However, "[u]nion security is properly a 'condition of

employment' within the meaning of Sec. 9(a) of the National Labor Relations Act and hence, is within the statutory area of collective bargaining." *NLRB v. Andrew Jergens Co.*, 175 F.2d 130, 133 (9th Cir. 1949). Hence the question of whether the CBA would contain a union-shop or a maintenance-of-membership provision was a mandatory subject. As to non-mandatory matters, "each party is free to bargain or not to bargain." *Fibreboard*, 379 U.S. at 210 (quoting *NLRB v. Wooster Div. of Borg-Warner*, 356 U.S. 342, 349 (1958)). However, neither party may "refuse to enter into agreements on the ground that they do not include some proposal which is not a mandatory subject of bargaining." *Borg-Warner*, 356 U.S. at 349. "[S]uch conduct is, in substance, a refusal to bargain about the subjects that are within the scope of mandatory bargaining." *Ibid.; see also Taylor Warehouse Corp. v. NLRB*, 98 F.3d 892, 901 (6th Cir. 1996) ("The parties may also bargain about any other lawful proposal, but may not insist to impasse on proposals concerning non-mandatory subjects of bargaining.").

Pleasantview's negotiation stance combined offers with respect to a mandatory subject, union security, and with respect to a non-mandatory subject, the collection clause. It offered alternatively to agree to a union-shop provision in return for an elimination or modification of the collection clause *or* to agree to the collection clause in return for a change from a union-shop provision to a maintenance-of-membership provision. The NLRB in its analysis chose to sever the mandatory and the non-mandatory subjects. In that analysis, Pleasantview simply insisted to an impasse on a change in the collection-clause, a non-mandatory subject, violating its duty to negotiate the mandatory subjects in good faith. As this severance of the subjects does not reflect the evidence regarding Pleasantview's negotiation stance, we cannot agree.

The NLRB itself has repeatedly recognized the permissibility of linking mandatory and non-mandatory

subjects in labor negotiations. In *Nordstrom Inc.*, 229 N.L.R.B. 601 (1977), the NLRB stated:

> That a party may not lawfully insist upon the inclusion of proposals nonmandatory in nature is, of course, clear. But the General Counsel's case moves, in our view, beyond that proposition to the extent that it negates the considerable relationships which may exist between both mandatory and nonmandatory subjects. Certainly, nonmandatory subjects . . . can, as a function of cost, bear upon a party's wage-increase proposals [, a mandatory subject]. To say that the proponent of the [non-mandatory subject proposal] cannot insist upon the inclusion of such a proposal means no more than that. It does not mean that once, out of necessity, the nonmandatory proposal is removed from the table, the proponent of the nonmandatory subject is not permitted to alter those proposals which are mandatory in light of the removal of the nonmandatory subject.

*Id.* at 601. The ALJ in *Laredo Packing Co.*, 254 N.L.R.B. 1 (1981), whose rulings, findings, and conclusions were affirmed by the Board, stated that:

> The question presented herein is whether the Union could effectively conclude negotiations on December 14 by agreeing to those demands of Respondent which constitute mandatory subjects of bargaining, even though there was no agreement on Respondent's demands encompassing the nonmandatory bargaining subjects. Under the circumstances of this case, I am persuaded that Respondent was not obligated to abide by so much of the contract which related to the agreed-upon mandatory subjects. The record . . . reveals that the nonmandatory subjects of bargaining advanced by Respondent as a condition for executing a collective-bargaining agreement were part of one collective-bargaining package and were an essential quid pro quo for

Respondent's contract proposal. It is for this reason that I find that during the time material herein Respondent and the Union had not reached agreement on all of the terms of a collective-bargaining agreement and for this reason I shall recommend that this allegation be dismissed.

*Id.* at 18 (citing *Nordstrom*; *John Nickels & Leonard Whitney*, 171 N.L.R.B. 1491 (1968); and *N.C. Furniture*, 121 N.L.R.B. 41 (1958)). Finally, in *Good GMC*, 267 N.L.R.B. 583 (1983), the Board concluded in similar circumstances that the employer had "neither failed to execute an agreed-upon contract nor insisted to impasse on the inclusion of a nonmandatory subject of bargaining in the contract." *Id.* at 585.

Permitting labor and management negotiators to link mandatory and non-mandatory subjects in proposed package deals does not eradicate the distinction. The negotiators remain enjoined to negotiate on mandatory subjects, but need not do so on non-mandatory subjects. Disagreement on non-mandatory subjects only still cannot lead to a valid impasse:

> Circumstances may . . . exist where a party unlawfully insists on a nonmandatory subject's inclusion at a time when all other matters have previously, and independent of the outstanding nonmandatory subject, been agreed upon. But whether such insistence amounts not only to a refusal to bargain in good faith but, further, as justification for compelling that party to execute so much of the contract as relates to the agreed-upon mandatory subjects is not . . . an issue . . . where it is clear that those nonmandatory subjects proposed by Respondent were part of a package containing the wage proposal.

*Nordstrom*, 229 N.L.R.B. at 602 (citing *S. Cal. Pipe Trades Dist. Council No. 16*, 167 N.L.R.B. 1004 (1967)); *see also Good GMC*, 267 N.L.R.B. at 584. Admittedly, where

mandatory and non-mandatory subjects are linked, an unbridgeable disagreement on the non-mandatory subjects may make agreement on the mandatory subjects more difficult, or even lead to a genuine impasse on the mandatory subjects which would not exist if there had been agreement on the non-mandatory subjects. However, that reflects no more than the necessary economic relationship that may exist between the subjects, which was recognized as valid in *Nordstrom*. 229 N.L.R.B. at 601.

Such is the case here. Pleasantview was concerned that the reduced net wages received by employees because of the deduction of union initiation fees would render its pay package uncompetitive with those offered by other nursing homes that did not have to deduct union initiation fees. Pleasantview saw the elimination of the collection clause, or suspension until competitors operated under similar clauses, as one way of alleviating this concern. An alternative, and from the point of view of Pleasantview equivalent, solution was replacement of the union-shop clause with a maintenance-of-membership clause.

Under a maintenance-of-membership provision, new hires could choose whether to join the Union and pay the initiation fees. To those who declined membership in the Union, the pay package would be the same as without a collection clause and hence as attractive as those of competitors without collection clauses. Those new hires who chose to join the Union, and therefore paid the initiation fee, would do so voluntarily and hence presumably regarded the package of pay (reduced by the initiation fee) plus Union membership to be at least equivalent to the full pay package without Union membership.

For both groups of new hires, the collection clause would no longer present a deterrence against coming to work for Pleasantview. Therefore Pleasantview's alternative offers during the labor negotiations represented two reasonably

equivalent ways of accommodating its needs. The linkage arose organically out of the economic relationship between the mandatory and non-mandatory subjects and was not an attempt to make an end-run around the distinction between mandatory and non-mandatory subjects. Hence it was permissible. Moreover, neither of Pleasantview's offers with regard to the collection clause was outlandish. Both would have preserved the *de facto*, if not the *de jure*, status quo. Hence they do not even constitute evidence of bad faith on the part of Pleasantview, and no unfair labor practice was committed.

### E

The final unfair labor practice alleged was the implementation of Pleasantview's final offer without the existence of a valid impasse. "[A]n employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment." *Litton Fin.*, 501 U.S. at 198 (citing *Katz*). Impasse is defined as "that point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless." *Advanced Lightweight Concrete Co.*, 484 U.S. at 543 n.5 (quoting *Advanced Lightweight Concrete Co.*, 779 F.2d 497, 500 n.3 (9th Cir. 1985)). "While that state of affairs that constitutes an impasse is not subject to precise definition, at least it encompasses the notion that both sides are aware of precisely what is at issue and that they have made more than a perfunctory attempt to reach a resolution." *Blue Grass Provision Co. v. NLRB*, 636 F.2d 1127, 1130 (6th Cir. 1980) (citing *Taft Broad. Co.*, 163 N.L.R.B. 475 (1967)). "Absent a *valid, good-faith impasse*, a company's [unilateral implementation] constitute[s] a breach of its duty to bargain under § 8(a)(5) and (d) of the National Labor Relations Act." *NLRB v. Brown-Graves Lumber Co.*, 949 F.2d 194, 198 (6th Cir. 1991) (emphasis added) (citing NLRA § 8(a)(5)&(d), 29 U.S.C. § 158(a)(5)&(d); *Katz*, 369 U.S. at 743-48).

In the present case, Pleasantview declared the existence of an impasse in the negotiation session on September 17 and unilaterally implemented its final offer on September 22. The NLRB, though it erroneously blames the impasse on failure to reach agreement on the non-mandatory issue of the collection clause, concedes the existence of impasse. Hence, the sole remaining question is whether the impasse was invalid because it was brought about by Pleasantview's failure to bargain in good faith. The NLRB points to Pleasantview's unfair labor practices as evidence of bad faith. However, there is no "presumption that an employer's unfair labor practice automatically precludes the possibility of meaningful negotiations and prevents the parties from reaching a good faith impasse." *NLRB v. Cauthorne*, 691 F.2d 1023, 1025 (D.C. Cir. 1982) (citing *Rayner v. NLRB*, 665 F.2d 970, 976-78 (9th Cir. 1982)). "To find otherwise would reflect 'an impermissibl[e] punitive justification for continuing liability when good faith negotiations between the parties have exhausted the prospects of concluding an agreement.'" *La Porte Transit Co. v. NLRB*, 888 F.2d 1182, 1186 (7th Cir. 1989) (quoting *Cauthorne*, 691 F.2d at 1025). "[A]n employer's unilateral change in wages or working conditions, while perhaps constituting some evidence concerning the good faith of his subsequent overtures, is not dispositive." *Cauthorne*, 691 F.2d at 1026 n.5 (citing *NLRB v. Pac. Grinding Wheel Co.*, 572 F.2d 1343, 1348 (9th Cir. 1978)). Where the employer's "unlawful conduct away from the bargaining table did not contribute to the deadlock in negotiations," the impasse is not invalidated. *Litton Sys.*, 300 N.L.R.B. 324, 333 (1990).

In the present case, we have rejected the NLRB's two major unfair labor practices allegations regarding the negotiations: (1) insistence to impasse on modification of the collection clause; and (2) failure to negotiate in good faith with respect to the holiday and pension buy-backs. The remaining unfair labor practices, the increase of some starting wages during the negotiations and the failure to collect union initiation fees

during the six months preceding the impasse, "involved minor topics only and [were] far from crucial to the failure of the parties to reach an agreement." *Litton Sys.*, 300 N.L.R.B. at 333. The wage increase affected only six out of seventy-eight employees and was so insignificant that the Union only learned of it weeks later from Pleasantview. The Union's response when it did learn of the increase is also instructive. While, as we explained above, the Union did not clearly and unmistakably consent to the increase or waive its right to bargain on the issue, neither did it strenuously object, as might have been expected if it felt that this unilateral change seriously undermined its bargaining position. Nor did this change remove the incentive for Pleasantview to continue to negotiate in good faith, as the NLRB contends. Pleasantview sought a substantial wage increase for all seventy-eight represented employees. A wage increase for a handful of recent employees might have slightly and temporarily decreased the pressure on Pleasantview to reach agreement immediately, but it did not solve its long-term problem. Therefore it is not surprising that negotiations between the Union and Pleasantview continued along the same lines for more than a month after the Union learned of the wage increase. As to Pleasantview's failure to remit the initiation fees, it merely continued a long-standing practice in which the Union had acquiesced for more than a decade with only a single brief objection more than a year before the negotiations. Neither of these unfair labor practices was sufficient to taint the negotiations to a degree as to call into question Pleasantview's good faith. Therefore, a valid impasse existed on September 17 and Pleasantview was within its rights to implement its final offer on September 22.

### III

In the alternative to a finding of a valid impasse, in Section II. E, above, Pleasantview also argues that it was under no duty to recognize or negotiate with the Union after the collapse of the strike because the Union has lost majority

support. To "withdraw recognition of a union, an employer has the burden of demonstrating (1) that the union in fact did not enjoy majority support; or (2) that it had a good-faith belief, founded on a sufficient objective basis, that the union no longer represented a majority of the employees." *Columbia Portland Cement Co. v. NLRB*, 979 F.2d 460, 464 (6th Cir. 1992) (citing *NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 787 (1990)). "To prove an actual lack of majority support, the employer must make a numerical showing that a majority of employees opposed the union as of the date that union recognition was withdrawn." *NLRB v. Hollaender Mfg. Co.*, 942 F.2d 321, 325 (6th Cir. 1991). To sustain the burden of proving good faith belief, the employer must supply "objective considerations which are clear, cogent and convincing." *Columbia Portland Cement Co.*, 979 F.2d at 464 (quoting *NLRB v. Flex Plastics, Inc.*, 726 F.2d 272, 275 (6th Cir. 1984)).

Pleasantview bases its contention that the Union had lost support of a majority of its members on the fact that the September 22 strike was not honored by the large majority of the represented employees, resulting in its collapse after one shift, and on Pleasantview's receipt, no later than September 23, of letters of withdrawal from the Union by more than three-quarters of the represented employees. The NLRB objects that neither of these occurrences conclusively demonstrates that a majority of the represented employees intended to end representation by the Union. *See Retired Persons Pharmacy v. NLRB*, 519 F.2d 486, 491 (2d Cir. 1975) (stating that the issue is "not how many employees belonged to the union or paid dues but rather whether a majority desired union representation for purposes of collective bargaining."). *See also NLRB v. Wallkill Valley Gen. Hosp.*, 866 F.2d 632, 637 (3d Cir. 1989) (citing *Retired Persons Pharmacy*, 519 F.2d at 491, for the proposition that there is "a clear distinction between union membership and majority support for collective bargaining representatives").

The NLRB contends that the employees could have crossed the Union's picket lines out of economic necessity while still desiring representation by the Union and that almost all the letters of withdrawal merely ended membership in the Union, possibly to avoid Union fines, while not explicitly terminating Union representation. However, these are mere theoretical possibilities unsupported by record evidence. Instead, the evidence shows that an overwhelming majority of the represented employees, when apprised of their Union's and their employer's bargaining positions, refused to support the strike and took the opportunity to work under the terms proposed by Pleasantview. Short of a decertification petition signed by a majority of the employees, it is difficult to imagine clearer evidence that most represented employees rejected further representation by the Union. At the very least, these facts supported by clear, cogent, and convincing evidence Pleasantview's good faith belief that the Union no longer represented a majority of employees.

Next, the NLRB argues that even if a majority of represented employees wished to terminate their representation by the Union, this termination was tainted by Pleasantview's unfair labor practices. "[A]n employer may not avoid its duty to bargain by relying on any loss of majority status attributable to his own unfair labor practices." *Master Slack Corp.*, 271 N.L.R.B. 78, 84 (1984) (citing *Pittsburgh & New England Trucking Co.*, 249 N.L.R.B. 833, 836 (1980)). For the disaffection to be attributable to the unfair labor practices, they "must have caused the employee disaffection . . . or at least had a 'meaningful impact' in bringing about that disaffection." *Master Slack*, 271 N.L.R.B. at 84 (quoting *Deblin Mfg. Corp.*, 208 N.L.R.B. 392, 402 (1974)). Factors to weigh are "whether the unfair labor practice 'tended to (1) have a detrimental or lasting effect upon employees; (2) cause employee dissatisfaction with the union; or (3) disrupt employee morale, deter their organization activities, and discourage their membership in the union.'" *Lee Lumber & Bldg. Material Corp. v. NLRB*,

117 F.3d 1454, 1458 (D.C. Cir. 1997) (quoting *Williams Enters. v. NLRB*, 956 F.2d 1226, 1236 (D.C. Cir. 1992)), *aff'g in part and remanding in part* 322 N.L.R.B. 175 (1996); *see also Master Slack*, 271 N.L.R.B. at 84 (citing *Olson Bodies*, 206 N.L.R.B. 779 (1973)), for a similar list of factors).

With respect to the unfair labor practices on which we grant enforcement (Pleasantview's breach of the collection clause and the increase of the wages of six employees), these factors strongly point away from finding a causal connection with the termination of Union representation. The breach of the collection clause did not have a detrimental effect on the employees; it *increased* their take-home pay. Nor would it induce employee dissatisfaction with the Union; to the contrary, employees would be more likely to approve of the Union if they could enjoy its benefits without deduction of the initiation fees. Nor is there any argument that this breach would disrupt employee morale or discourage membership in the Union. Arguably, Pleasantview's failure to remit the initiation fees did deter the Union's organization activities by depriving it of funds. However, the decision of most employees to quit the Union over the course of less than a week, cannot plausibly be attributed to this lack of funding, which had persisted with the Union's acquiescence for over a decade. Similarly, with respect to the wage increase: It did not have a detrimental effect on any employees, could not have caused employee dissatisfaction with the Union, disrupted employee morale, discouraged Union membership, or deterred organization activities. Therefore, we conclude that there was no causal connection between Pleasantview's unfair labor practices and the Union's loss of support. Hence Pleasantview was entitled to cease recognizing or bargaining with the Union no later than September 23 and is not required to reopen bargaining.

Finally, Pleasantview contends that the equitable doctrine of laches prevents enforcement of the NLRB's order against

it.[5] "[A]t some point laches [will] apply against the Board for inordinate delay in bringing an action." *NLRB v. Mich. Rubber Prods.*, 738 F.2d 111, 113 (6th Cir. 1984). However, where "there is no allegation that the delay has in any way prejudiced respondent, or given the Board, or union, an unfair advantage," the "doctrine of laches will not apply." *Ibid.* (citing *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1161 (5th Cir. 1982), and *NLRB v. Norfolk Shipbuilding and Drydock Corp.*, 172 F.2d 813 (4th Cir. 1949)). Pleasantview's sole allegation of prejudice was that the Board's order would require it to reopen negotiations with the Union more than five years after the Union lost support of a large majority of covered employees. As this part of the NLRB's order is reversed by our decision here, the question of laches is moot. With respect to the parts of the NLRB's order affirmed here, there is no issue of unfair prejudice.

## IV

For the foregoing reasons, we **AFFIRM** the NLRB's conclusion with respect to Pleasantview's non-collection of the initiation fees and with respect to the increase of some starting wage during the 1996 negotiations. We **REVERSE** the NLRB's conclusion with respect to Pleasantview's alleged failure to negotiate the holiday and pension provision, the alleged insistence to impasse regarding the collection clause, and the implementation of the final offer without existence of a valid impasse. Therefore, Pleasantview's petition for review is **GRANTED** in part and denied in part, the NLRB's cross-petition for enforcement is granted in part and **DENIED** in part, and the NLRB's order is **VACATED**.

---

[5] There is no legal bar to delayed enforcement. "Inordinate delay in any case is regrettable, but Congress has introduced no time limitation into the Act except that in § 10(b)," which requires a charge to occur within six month of the alleged unfair labor practice. *Katz*, 369 U.S. at 748 n.16; NLRA § 10(b), 29 U.S.C. § 160(b).

The matter is **REMANDED** to the NLRB for further proceedings and orders not inconsistent with this opinion.