MARTINSVILLE NYLON EMPLOYEES COUNCIL CORPORATION, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

E.I. DuPont DeNemours and Company, Intervenor.

No. 89–1377.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 5, 1990.

Decided July 31, 1992.

Jonathan G. Axelrod, for petitioner.

Scott D. MacDonald, attorney, NLRB, with whom Aileen A. Armstrong, Deputy Associate Gen. Counsel, and Peter Winkler, Supervisory Atty., NLRB, were on the brief for respondent.

Raymond M. Ripple was on the brief for intervenor.

Before WALD, D.H. GINSBURG, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

Dissenting opinion filed by Circuit Judge WALD.

D.H. GINSBURG, Circuit Judge:

The National Labor Relations Board dismissed portions of a complaint alleging that E.I. Dupont DeNemours & Co., by newly insisting upon strict adherence to the terms of a collective bargaining agreement (CBA), refused to bargain with the Martinsville Nylon Employees' Council Corporation (the Union) and unilaterally implemented a midterm modification of their CBA, in violation of §§ 8(a)(1) & (5) and 8(d) of the National Labor Relations Act. 29 U.S.C. §§ 158(a)(1) & (5) and 158(d). The NLRB held that the "entire agreement"

and "no oral modification" clause of the CBA precluded incorporation into the agreement of inconsistent past practices. Accordingly, the Employer's strict adherence to the agreement did not constitute a modification. We agree with the Board on that point, but remand for it to determine whether interpretation of the CBA in the light of past practices requires any different result.

## I. BACKGROUND

As part of a general effort to increase productivity at its Martinsville, Virginia manufacturing facility, the Employer presented a "Union Officials and Council Representatives Productivity Proposal" to the Union for negotiation in February 1987. Prior to that time, Union officials enjoyed essentially unhindered freedom to attend to the Union's rather than the Employer's business on company time and with pay; they pursued grievances; policed the contract, and visited "the union's office at the plant [ ] to discuss with fellow representatives or union officials [ ] possible emerging contractual or labor related problems and to research such issues"—often switching shifts in order to do so. *E.I. Dupont De-Nemours & Co.* (cases 5–CA–18636 & –18736), slip op. at 4 (May 17, 1988) (*ALJ Decision*). The Productivity Proposal was designed to restrict this activity by requiring each Union official (except the President) to work his assigned shift, answer a series of five questions and obtain permission before leaving his post to pursue a grievance, and curtail the conduct of other Union business on company time. *Id.* at 2–4.

The Union refused to negotiate about the proposal, stating that it was a matter to be discussed the next time the CBA was to be renegotiated. In March 1987 the Employer implemented the Proposal unilaterally. The Union thereupon "insist[ed] that any future negotiations [*i.e.,* on any matter] ... take place off-plant at a neutral location after 4:30 p.m., a position the Union maintained from that time forward." *Id.* at 3. The Employer in turn insisted upon continuing the parties' long-standing practice

of meeting at the plant during the day shift. *Id.* at 10.

The Union then charged that the Employer's refusal to meet off-premises and during the non-daylight shifts was unreasonable, in violation of §§ 8(a)(1) & (5). The Union also charged that the Employer had modified the CBA, in violation of §§ 8(a)(5) and 8(d), by unilaterally implementing the Productivity Proposal. Before an Administrative Law Judge, the Union argued that past practice had established the right of Union officials to pursue Union activities on paid time, that such practice had been incorporated into the contract, and that the Productivity Proposal thus amounted to a unilateral mid-term modification of the CBA.

The ALJ held that "the contract covers and controls the subject matter of the alleged unilateral action," and that past departures from the contract did not amount to a prospective waiver of the Employer's rights. *ALJ Decision* at 5 & n. 6. The Productivity Proposal therefore was not an unlawful mid-term modification of, but merely a return to "literal interpretation" of, the contract. In reaching this conclusion the ALJ relied upon Article XII of the CBA, which set out the procedure by which the Union was to pursue grievances with the Employer; and upon Article II § 3, the so-called "zipper" clause, consisting of both an "entire agreement" provision and a "no-oral-modification" provision:

> This [CBA] constitutes the entire Agreement between the parties hereto as of the execution date hereof. However, any supplement which may hereafter be mutually agreed upon between the parties when executed in the same manner as this Agreement shall become and be part of this Agreement.

The ALJ also held that the Employer's insistence that negotiations take place at its premises during the day shift was consistent with long-standing practice and consequently not unreasonable. *ALJ Decision* at 11–12.

On appeal, the NLRB affirmed the ALJ's ruling with respect to the time and place of negotiations, but modified his ruling con-

cerning the Productivity Proposal. 294 NLRB No. 43 (May 31, 1989). The Board allowed that a CBA could in some circumstances incorporate "past practices that are not specifically written into it," but interpreted the zipper clause of the present CBA to bar unwritten changes to the extent that they are inconsistent with the written terms of the contract. 294 NLRB No. 43, slip op. at 3. The Board thus distinguished between restrictions upon the Union's activity "that were, in effect, nothing more than implementations of the express terms of the [CBA] and restrictions that amounted to new requirements that were both inconsistent with past practice and not contained within the agreement." *Id.* at 2.

With respect to the specifics of the Productivity Proposal, the Board stated that:

the past practice by which employee/union representatives spent substantial amounts of paid time during their work shifts conducting nongrievance-related union business conflicts with the parties' written agreement on the activities of such representatives on paid time. Therefore, to the extent that the [Employer] proposed to limit union representatives to the activities defined in article XII of the collective bargaining agreement, we find that it did not make an unlawful midterm modification of the agreement.

Referring to the "five questions" to be answered before a Union representative could leave his work in order to pursue a grievance, the Board continued:

However, the [Employer] did not content itself with retreating to the bare bones of the contract terms. It added new procedures that were inconsistent with existing practice and that, at least in one respect [*i.e.*, one of the five questions], could not fairly be implied from the contract terms.

*Id.* at 3.

Because the Board viewed this one aspect of the Productivity Proposal as going beyond the safe harbor of the written contract (as well as conflicting with past practice), it found that the Employer had unilat-erally modified an implied term of the contract. Accordingly, the Board ordered the Employer to drop the offending portion of the Productivity Proposal, and dismissed the remainder of the complaint. Only the Union petitions for review.

## II. UNILATERAL MODIFICATION

The Union challenges the Board's decision on two distinct grounds. First, it argues that the Board erred in interpreting the zipper clause to bar modification of the CBA by any practice inconsistent with its terms. The Union claims that "even an express stipulation against oral modification is no bar to the parties' right to contract anew [*i.e.*, by their conduct] on the subject, since such a stipulation, like any other term of the contract, may be rescinded or amended." Second, assuming that the NLRB's interpretation of the zipper clause is correct, the Union argues that the Board misread the substantive terms of the CBA when deciding which past practices were inconsistent with the written agreement. In particular, the Union claims that the contract simply does not address the conduct of nongrievance-related Union activities, so that the past practice of doing Union business on company time cannot be in conflict with the CBA.

In reviewing the NLRB's decision, we do not defer to the Board's interpretation of the contract. Although we normally defer to the Board on matters of policy and on the interpretation of the NLRA, it is the responsibility of the federal courts to make "the federal common law of collective-bargaining agreements." *Litton Fin. Printing Div. v. NLRB,* —— U.S. ——, 111 S.Ct. 2215, 2223–24, 115 L.Ed.2d 177 (1991), citing *Local Union 1395, IBEW v. NLRB,* 797 F.2d 1027, 1030–31 (D.C.Cir.1986); *see The Idaho Statesman v. NLRB,* 836 F.2d 1396, 1401 (D.C.Cir.1988). The Board's factual findings must be upheld if supported by substantial evidence, but "[t]o the extent that the Board interprets a past agreement ... those findings are properly regarded as 'ultimate legal conclusion[s] attached to the parties' words and conduct,' and are not entitled to special deference

from this court." *Id.* at 1401 (citations deleted).

### A.

■ The Union's argument that the no-oral-modification requirement is essentially unenforceable because it is itself subject to subsequent oral modification has a considerable pedigree in the common law of contracts. Farnsworth, Contracts 475 (1982); *see, e.g., City of Indianapolis v. Twin Lakes Enterprises, Inc.,* 568 N.E.2d 1073, 1084–85 (Ind.App. 1 Dist.1991) ("Even a contract providing that any modification thereof must be in writing may nevertheless be modified orally"); *Linear Corp. v. Standard Hardware Co.,* 423 So.2d 966, 968 (Fla.App. 1 Dist.1982) (oral modification allowed "despite the requirement of a writing"). Although the Union does not cite any case applying the common law rule to a CBA, we have found one in *Certified Corp. v. Hawaii Teamsters & Allied Workers, Local 996,* 597 F.2d 1269, 1271 (9th Cir.1979), of which more below; *see also* dicta in, *e.g., Mohr v. Metro East Mfg. Co.,* 711 F.2d 69, 72 (7th Cir.1983).

In modern times the common law rule has been discarded in broad areas. Most significantly, the Uniform Commercial Code, as enacted in every state, provides with respect to contracts for the sale of goods:

A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party.

§ 2–209(2); *cf.* UCC § 2–208(1) ("course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement"). *See also Wisconsin Knife Works v. Nat'l Metal Crafters,* 781 F.2d 1280, 1284–85 (7th Cir.1986) (Wisconsin UCC); *South Hampton Co. v. Stinnes Corp.,* 733 F.2d 1108, 1117 (5th Cir.1984) ("no-oral-modification clauses are binding in Texas" under UCC); *Elmsford Sheet Metal Workers, Inc. v. Shasta Indus.,* 103 A.D.2d 764, 477 N.Y.S.2d 391, 392 (2 Dept.1984) (same in New York); *cf. Martens v. General Foods Corp.,* 276 A.D. 1053, 96 N.Y.S.2d 329, 329–30 (4 Dept.1950) (same in pre-UCC sale of goods case). In other contexts, the old rule has been limited but not discarded altogether. *See* N.Y.Gen.Oblig.L. § 15–301(1) ("written agreement ... which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed"); Cal.Civ.Code § 1698 (same). Even where the common law rule persists, there are other exceptions. In some states, if a contract, as modified, would fall within the scope of the Statute of Frauds, then the modification must be in writing. *See, e.g., Mar–Lan Indus. v. Nelson,* 635 S.W.2d 853, 855 (Tex.App.1982).

The drawback of the common law rule is that it denies to all contracting parties, no matter how sophisticated, the ability to decide for themselves whether to restrict the manner in which their agreement may be modified. The UCC rule, on the other hand, enables those parties who mutually value certainty in their relations to have it; under the UCC rule, moreover, no one has to agree to rule out oral modifications nor, having so agreed, are the parties precluded from executing a mutually agreeable modification.

The parties to a CBA, like "merchants" within the meaning of UCC § 2–104, are sophisticated. Their agreement is the product of substantive negotiations between intensely interested parties, usually advised by specialized counsel. They ought not be presumed to have included in their agreement a meaningless provision against oral modifications. Nor is there any need to fear that either party may have missed the fine print or somehow been taken advantage of in agreeing that there shall be no oral modifications.

Absent some countervailing consideration of labor policy, therefore, it certainly seems that all potential parties to a CBA are better off under the UCC rule, which gives them the flexibility to specify as they see fit how their agreement may be mod-

ified. *See Merk v. Jewel Cos.*, 945 F.2d 889, 902–03 (7th Cir.1991) (Easterbrook, J., dissenting) ("Flexibility entails giving labor and management the option of ... banning oral side agreements.... Parties may choose for themselves"). The Union adduces no policy reason for constraining the parties.

The only purported reason we can find for preferring the rule of the common law to that of the UCC appears in *Certified Corp., supra*, where the Ninth Circuit suggested that overriding a no-oral-modification clause in a CBA "effectuates the federal policy of maintaining 'industrial peace.' It encourages resolution of labor disputes by negotiation rather than by the economic pressure of a strike." 597 F.2d at 1271. The *Certified* court did not, however, explain how overriding a negotiated no-oral-modification clause encourages negotiation of industrial disputes. We think it more likely that judicial disregard for the parties' expressed intent that any modification be in writing is more likely to promote industrial strife by encouraging prevarication about who said what to whom, and to create uncertainty about what a court will determine are the actual obligations of the parties.

In any event, because the oral modification in *Certified* merely extended the duration of the CBA, and thus could be viewed as an independent oral contract, the court's opinion that the no-oral-modification clause was without effect was not strictly necessary to the result. And as for the *Certified* court's actual holding that "a collective bargaining agreement need not be in writing in order to be enforceable," *id.* at 1272, of course we have no quarrel. *See also, e.g., NLRB v. Haberman Constr. Co.,* 641 F.2d 351, 355–56 (5th Cir.1981). (We note that no other circuit has had occasion to hold one way or the other on the status of a no-oral-modification clause.)

With virtually nothing to commend receiving the common law rule into "the federal common law of collective-bargaining agreements," *Litton, supra*, we are confident that the UCC rule will better serve the purposes of collective bargaining and of industrial peace. Judicial respect for a no-oral-modification clause enables parties who value certainty to provide for it in their written agreement while taking nothing away from parties who prefer some uncertainty, perhaps as the price of the arguably greater flexibility attendant to oral modifications.

### B.

We need not finally choose today between the common law and UCC rules concerning no-oral-modification clauses, however, because the CBA before us also contains an "entire agreement" clause. Whatever the ultimate merits of the common law rule denying effect to the no-oral-modification clause, by including the entire agreement clause the parties here made clear beyond doubt their intention not to be bound to any informal arrangement to which they might voluntarily adhere during the term of their CBA. In effect, each told the other: "If you want anything else, you'll have to get it in writing," and to this both agreed.

The Board correctly held that the entire agreement clause forecloses incorporation into the contract of past practices that are inconsistent with the contract. The Board then, however, said that where a contract contains an entire agreement clause "and the past practices in question are *inconsistent* with the written terms, those practices cannot properly be considered implied terms of the agreement." *Board Decision,* 294 NLRB No. 43, slip op. at 3 (emphasis in original). The clear implication is that a practice not inconsistent with the CBA (*i.e.*, it adds to rather than alters it) *is* incorporated into the CBA. Yet such an accretion would itself be flatly inconsistent with the entire agreement clause.

The Board claimed to have found precedent for its distinction between "consistent" and "inconsistent" past practices in "the construction of 'entire agreement' clauses often followed by arbitrators." *Id.* at 3 n. 2, citing *Wallace Murray Corp.,* 72 LA (BNA) 470, 474 (1979); *American Seating Co.,* 16 LA (BNA) 115, 117 (1951); *see also* Elkouri & Elkouri, How Arbitration

Works 449–51 (4th ed. 1985). Each of those cases, however, involves an entire agreement clause simpliciter. In that situation, an oral modification that changes the agreement is not inconsistent with the agreement; the agreement as modified is then the "entire agreement."

The additional requirement in this case that any further agreements be in writing indicates that the parties anticipated the possibility of entering into further agreements and specifically provided a procedure for incorporating them into their CBA— regardless of whether they merely go beyond the terms of the written contract or actually conflict with it. Again, we see no policy reason to ignore the plain intent of the parties to limit their contractual liability to those agreements to which they have affixed their signatures. Because the no-oral-modification clause, in combination with the entire agreement clause, precludes any non-written modification of the CBA, it is irrelevant whether a particular past practice (viewed in isolation) is consistent with the written contract; absent a written modification, no past practice could become part of the contract.

## C.

■ Although the parties to the CBA specifically precluded any non-written modification of their agreement, past practice may still inform the Board's understanding of what the written agreement means. Indeed, the parties' course of performance may be the best evidence of their intent in using a particular term. *See e.g., Carey Canada, Inc. v. Columbia Casualty Co.,* 940 F.2d 1548, 1555–57 (D.C.Cir.1991) (applying Florida and Illinois insurance law); UCC § 2–208(1), above; UCC § 2–208(2) (course of performance and express terms of contract should be construed as consistent "whenever reasonable").

In this case, however, the Board made no inquiry into the bearing of past practice upon the meaning of the terms of the written contract. The ALJ stated rather matter of factly that when the Employer unilaterally implemented the Productivity Proposal it "returned to a literal interpretation of the contract and strict enforcement of its rights thereunder." Although the ALJ did not elaborate, he did (in a footnote distinguishing another case) state that in this case "the contract covers and controls the subject matter of the alleged unilateral action," after which he set out Articles II and XII in their entirety. While the matter is not free from doubt, the ALJ's view appears to be that the contract can be fully understood without regard to any extrinsic evidence, such as the parties' course of dealing under it.

As for the Board, it merely rephrased the ALJ's conclusion, stating only that the Employer's "bargaining position was essentially to return to the written terms of the agreement." To be sure, the Board went on to disavow the "suggest[ion] that an agreement can never be read as encompassing past practices that are not specifically written into it"; here, however, the Board said the past practices could not be incorporated into the agreement, in view of the entire agreement clause, because they were "inconsistent" with the written agreement.

The Board, in establishing its dichotomy between past practices that are consistent and those that are inconsistent with the CBA, seems not to have considered at all the relevance of practice to the meaning of the CBA. This is foreshadowed in the ALJ's reference to the "literal interpretation of the contract" and the Board's reference to the "written terms of the agreement." Both seem to have assumed that the meaning of the contract is to be discerned entirely from within its four corners. In any event, the Board never turned its attention in earnest to the meaning of the contract in the light of past practice.

This is particularly unfortunate in a case such as this where the past practice predated the current contract. The Union and the Employer have had a bargaining relationship for over forty years. It was "in 1980 or shortly before" that the Employer began to allow Union officials and representatives to switch shifts in order to perform union duties, and relaxed the require-

ment that they obtain prior permission from their supervisor before leaving their work station to participate in grievance processing. They negotiated the present contract, however, only in 1986—less than one year before the Employer instituted the Productivity Proposal.

While it is possible, of course, that the terms of the 1986 CBA are not susceptible to more than one (*i.e.*, the "literal") interpretation, it is also possible that the agreement was meant to incorporate then-established practice. (For example, Article XII, § 5, provides that a union representative may process a grievance during working hours "after obtaining permission from his immediate supervision." Since the Employer had not since 1980 required a union representative to get permission each time before handling a grievance, could not § 5 refer to the apparently blanket permission that union representatives had been given in practice?) We do not think it appropriate for the court, however, to explore these possibilities in the first instance. Accordingly, we remand this aspect of the case to the Board for it to consider the relevance of past practice to the meaning of the contract as written.

III.  TIME AND PLACE OF NEGOTIATIONS

■ In a portion of his opinion adopted wholesale by the Board, the ALJ found that the Employer's insistence upon negotiating during the day shift and at its own premises was consistent with long-standing past practice, and hence not unreasonable in violation of §§ 8(a)(1) and (5). While some representatives on the Union bargaining committee would be unable to participate in negotiations unless they attended without pay during their off-shift, the Employer offered to negotiate at times when all of the key Union officials were working the day shift. *ALJ Decision* at 11.

The Employer is under no statutory (or for that matter contractual) obligation to provide paid time off from work for every Union representative who wants to participate in negotiations, and does not act unreasonably in declining this potentially costly demand. Here, the Employer went more than halfway to accommodate the concerns of the Union. Thus, we agree that the Employer did not refuse to negotiate at reasonable times and places.

IV.  CONCLUSION

The petition for review is granted in part and denied in part, and the case is remanded to the Board for further proceedings consistent with this opinion.

*So ordered.*

WALD, Circuit Judge, dissenting:

First, I write separately to express my disagreement with the panel's dicta in Part II. A. suggesting that "no-oral-modification" clauses in collective bargaining agreements should be strictly enforced. I agree with the panel that in interpreting and enforcing collective bargaining agreements under the federal labor statutes, federal courts are not bound by state common-law rules, but rather may, when necessary, fashion their own rules. Notably, however, the authority for this proposition, *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456–57, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957), is emphatic that the "courts *must* fashion [this federal common law] from the policy of our national labor laws" (emphasis added). The majority's references to freedom to contract, and the value of certainty, rationales drawn primarily from commercial areas of the law,[1] would mark a departure from that basic principle. My colleagues' stated preference for strict enforcement of "no-oral-modification" clauses was neither sub-

---

1.  I am unpersuaded that bargaining by commercial contractors is sufficiently similar to bargaining by labor and management that application of a rule generated in the commercial context is automatically appropriate for labor contracts. The vast *differences* between collective labor agreements and the general run of commercial contracts have been the frequent subject of expert comment. *See, e.g.,* Neil Chamberlain and James Kuhn, *Collective Bargaining* 54–56, 67–71 (1986); Harry Shulman and Neil Chamberlain, *Labor Relations* 3–7 (1949); Archibald Cox, *Rights Under a Labor Agreement,* 69 HARV. L.REV. 601, 606 (1956); George Taylor, *The Voluntary Arbitration of Labor Disputes,* 49 MICH. L.REV. 787, 795–98 (1951).

scribed to by the National Labor Relations Board ("Board") nor even argued to us on appeal. It seems to me to be unwise for the court to express its "confiden[ce] that the UCC rule will better serve the purposes of collective bargaining and of industrial peace," Majority opinion ("Maj. op.") at 1268, without even hearing from the parties or the Board as to whether or not it is likely to facilitate collective bargaining.

My colleagues take issue with the Ninth Circuit decision in *Certified Corp. v. Hawaii Teamsters & Allied Workers, Local 996*, 597 F.2d 1269, 1271 (9th Cir.1979), positing that "disregard for the parties' expressed intent that any modification be in writing is more likely to promote industrial strife by encouraging prevarication about who said what to whom, and to create uncertainty about what a court will determine are the actual obligations of the parties." Maj. op. at 1268. I believe *Certified Corp.* may have more to offer than my colleagues grant, primarily because, in Justice Goldberg's words:

> [P]arties are free by joint action to modify, amend, and supplement their original collective bargaining agreement.... There are too many unforeseeable contingencies in a collective bargaining relationship to justify making the words of the contract the exclusive source of rights and duties.

*Humphrey v. Moore*, 375 U.S. 335, 353–54, 84 S.Ct. 363, 373–74, 11 L.Ed.2d 370 (1964) (Goldberg, J., concurring). Allowing for flexibility in the performance of collective bargaining contracts, rather than mandating rigid certainty, would certainly seem to contribute to achieving smoother labor-management relationships, an incontrovertible goal of federal labor policies. *See, e.g., Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967) ("federal labor laws seek to promote industrial peace ... by fostering a system of employee organization and collective bargaining"). It is precisely the "unforeseeable contingencies," which Justice Goldberg recognized are prevalent in the collective bargaining relationship, that lead to the need for side agreements, limited arrangements for a discrete project, or other unanticipated modifications to the collective bargaining agreement. As one court has noted:

> [C]ollective bargaining agreements ... involve the triangle of often diverging interests of employers, unions, and employees covering a wide range of conduct and an enormous variety of problems. The necessary task of filling in the details is inherent. A collective bargaining contract operates prospectively over a substantial period of time and the parties cannot be expected to foresee all the problems that will develop in an industrial establishment within the period of the contract and more scope must be left for decisions made in the course of performing the agreement. The parties to a collective bargaining share a degree of mutual interdependence for the cost of disagreement is great and the pressure to reach agreement is so intense that the parties are willing to contract with the thought in mind of working out the problems of interpreting *and amending* when the inevitable problems arise.

*Watson v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers*, 399 F.2d 875, 879 (5th Cir.1968) (emphasis added).

Unanticipated amendments may, for example, be necessary in the context of a bid with a time deadline, or in other constraining situations where flexible procedures will make the difference between failure and success for both labor and management. Requiring that all such impromptu modifications be memorialized in writing (with attendant costs in time, effort, and money), may be counterproductive to the best interests of both sides. Further, union and management may informally agree over an extended period of time to allow seemingly innocuous practices that are not covered in the contract to become part of the settled expectations of the parties, without going through the formality of amending the contract. It may then be downright disruptive to the parties' bargaining relations to prevent these firmly established expectations from being enforced as part of the agreement.

My colleagues' preferences in interpreting both "no-oral-modification" and "zipper clauses," [2] may be based on economic theory but do not necessarily rest on any expertise, experience, or empirical data in the labor field. Their predictive difference with the Ninth Circuit, as to which rule would work better for industrial peace, is, at this point, simply a war of words.

Second, I have difficulty following the majority's rationale and disposition. As I read the Board's decision, it has pretty much done already what the majority tells it to do on remand. It has said that "we do not suggest that an agreement can never be read as encompassing past practices that are not specifically written into it" and indeed the ALJ and the Board went through the exercise of seeing whether certain past practices really were "nothing more than implementations of the express terms of the collective bargaining agreement." *Board Decision* at 2–3. I am by no means certain, on the other hand, that the Board ever said or necessarily implied that "a practice not inconsistent with the CBA ... *is* incorporated into the CBA." Maj. op. at 1268. But even if it did, the line between interpreting contract language in light of past practices and saying that established practices when consistent with contract language, will be deemed covered by the contract is a theoretical one at best. I can only wonder how distinctly it can be applied in practice. *See Board Decision* at 3, and note 2. I fear the majority plays the bull in a china shop in insisting that no-oral-modification and zipper clauses must be absolutely enforced, despite a history of arbitration rulings to the contrary and no judicial precedent in their favor. The Board seemed to me well within bounds in ruling on the basis of its own precedent that an established practice in carrying out a CBA would be honored or rejected on the basis of its consistency or inconsistency with the contract.[3] I think it is we who are being arbitrary and capricious in imposing our own preferred rationale for interpreting the delicate mix that must exist in the real world of CBAs between understandings, practices, and the written word.

I would affirm the Board.

2. It should be noted that the panel's interpretation of the "zipper clause" as forbidding any oral modification is not the only plausible reading of that clause which provides:

> This [ ] constitutes the entire agreement between the parties hereto as of the execution date hereof. However, any supplement which may hereafter be mutually agreed upon between the parties when executed in the same manner as this agreement shall become and be part of this agreement.

The language in the second sentence can be read as mere caveat to the first sentence, indicating that although this is "the entire agreement" for now, it can be amended later. The clause "when executed in the same manner" does not say that the agreement cannot be amended later by oral agreement.

3. While I personally disagree with the Board's interpretation that Article XII covered both grievance and bargaining meetings, and thus, would have found the "modification" in practice allowing more than five union representatives to attend bargaining meetings consistent with the collective bargaining agreement, that difference is in the final analysis "small potatoes," and I would defer to the Board's expertise on the matter.

Article XII of the collective bargaining agreement is titled "Adjustment of Grievances." It provides in relevant part:

> Section 1. The Union agrees to select an employee Committee of not more than five (5) officials and/or accredited Representatives, including a Chairperson, who shall constitute the Grievance Committee.
>
> ....
>
> Section 4. Meetings between elected officials and/or accredited Representatives of the Union and the Plant Management will be permitted on Company time and Company property in cases where such meetings are for the purpose of conferring with the Plant Management.... No change in the working hours of an elected official or Representative will be made for the purpose of conducting business of the Union except in cases where a Representative or elected official may make his own arrangements with another qualified employee, subject to the approval of his supervision....

The Board determined that the modification in dispute, a past practice of the Company allowing more than five Union Representatives to attend *bargaining* meetings, was inconsistent with Article XII §§ 1 & 4.