45 So.3d 897 (2010)
CORAL REEF DRIVE LAND DEVELOPMENT, LLC, Douglas F. Landsea and Robert J. Shelley, Appellants,
v.
DUKE REALTY LIMITED PARTNERSHIP, Appellee.
No. 3D09-2356.
District Court of Appeal of Florida, Third District.
September 22, 2010.
Rehearing and Rehearing En Banc Denied October 29, 2010.
*899 Isicoff, Ragatz & Koenigsberg and Eric D. Isicoff and Teresa Ragatz, Miami, for appellant.
Broad and Cassell and Gary E. Lehman, Miami, and Beverly A. Pohl, Fort Lauderdale, for appellee.
Before COPE and SALTER, JJ., and SCHWARTZ, Senior Judge.
SALTER, J.
Coral Reef Drive Land Development, LLC, appeals a summary judgment and final judgment of foreclosure entered in favor of Duke Realty Limited Partnership.[1] The issue is whether the appellants raised genuine issues of material fact for trial supporting legally sufficient claims that: (a) the lender exercised such control as to transform the debtor-creditor relationship into a joint venture, and (b) certain alleged verbal communications between representatives of Coral Reef and Duke Realty, considered in light of the sophisticated written agreements governing the parties' multi-million dollar development plans, constituted a binding commitment by Duke Realty to enter into a joint venture with Coral Reef. We concur with the trial court's assessment and affirm.
Our review of the interpretation and application of the contract provisions is de novo, and we consider the record by resolving "all doubts and inferences in favor of the non-moving party." Sheikh v. Coregis Ins. Co., 943 So.2d 242, 244 (Fla. 3d DCA 2006).

The Loan-with-Option
The detailed documents entered into by the parties have more bells and whistles than the once-conventional commercial promissory note and mortgage. The terms of the documents afforded Coral Reef a first mortgage loan of $10,000,000 for the purchase and initial development of some 12 acres of prime commercial property in southwest Miami-Dade County. The property adjoined Jackson South Community Hospital and was to be developed and leased as medical offices. Duke Realty, an Indiana-based commercial real estate development partnership, bargained for an option that essentially would allow it to acquire the property by paying Coral Reef a premium of $1,500,000 above the amounts necessary to repay the Duke Realty loan and to reimburse Coral Reef for the interest costs and rezoning expenses. In the event Duke Realty exercised the option, Coral Reef would then have the right to require the property to be contributed *900 to a joint venture in which Duke Realty would control 75%, and Coral Reef or its principals 25% of the venture.
This was meticulously documented in lengthy single-spaced documents: an 11-page promissory note; a 47-page recorded first mortgage, security agreement, and assignment of leases and rents; a 24-page loan agreement; and a 36-page form of limited liability company operating agreement (to be entered into if the applicable options were exercised in accordance with section 9.17 of the loan agreement). The loan agreement referred to these instruments collectively as the "Loan Documents." The agreements were reviewed by attorneys for the parties.
The Loan Documents contained common "boilerplate" termsa merger and integration provision, a waiver of the right to trial by jury, and a stipulation that no oral modification or waiver would be binding unless and until reduced to a written agreement signed by the parties. Importantly, the mortgage also included this provision:
9.18 No Joint Venture. Notwithstanding anything in any of the Loan Documents or in any other agreement or commitment to the contrary, neither the Loan Documents nor the transactions described in the Loan Documents nor the rights and obligations granted therein shall in any way create or contribute to the creation of a partnership or joint venture or similar arrangement between Borrower and Lender.
Regarding Duke Realty's exercise of its option to acquire the mortgaged property, the loan agreement addressed the timing and method of exercise in a lengthy option provision that included this language:
The Option shall be in effect from the date hereof until the date which is two (2) years after the date hereof and may be exercised by Lender, BD, or any other designee of Lender at any time upon written notice to Borrower (the "Option Notice").
The loan agreement also specified that any notice required or permitted under its terms "shall" be given in accordance with the notice provisions in the mortgage. Section 9.5 of the mortgage, "Notices," required that all notices required or permitted to be given "shall be in writing" and also specified how such notices were to be mailed or delivered.

Default, Emails, Development Activity, and Foreclosure
During 2006 and early 2007, representatives of Duke Realty participated actively with Coral Reef and its principals in studying the medical office needs and status of the Hospital, in monitoring the rezoning process, and in evaluating prospective architects and contractors. Coral Reef asserts that these representatives were identifying themselves and doing business as "development partners" of Coral Reef, not as the representatives of a lender. In early 2007, Duke Realty continued to comment on designs, tenant office layouts, and construction cost estimates in anticipation that the rezoning would be approved.
In April 2007, one of the principals of Coral Reef sent an email to a principal of Duke Realty stating that Coral Reef could not pay back interest due under the terms of the mortgage "due to unforeseen circumstances," and proposing a meeting to discuss restructuring the mortgage. A representative of Duke Realty then emailed a principal of Duke Realty to advise that "the partners" in the "deal south of Miami" "have evidently run into cash flow difficulties, and are not making debt payments." The final zoning approvals were thought to be forthcoming in about a month.
*901 The rezoning was indeed approved in May 2007. Coral Reef asserts that Duke Realty was "surreptitiously" using its own separate land use attorney to attend the zoning hearing and report to Duke Realty. Shortly after the rezoning, Douglas Landsea of Coral Reef allegedly had a telephone conversation with Donald Dunbar from Duke Realty in which Landsea allegedly asked for a "firm commitment" that Duke Realty would exercise its purchase option. Failing that, Landsea allegedly said, Coral Reef would refinance or sell the property and pay off the loan. Landsea maintains that Dunbar "unequivocally committed" that Duke Realty would exercise the option. One important consequence of an exercise of the option was that the defaulted interest would not be due at the closing. Corroboration for this confirmation is alleged by Coral Reef to be in an email in which Dunbar told his boss "I believe we will stay in the deal," and "I can't imagine not buying this dirt."[2] Coral Reef alleges that it relied on this commitment by eschewing active efforts to refinance the loan with Duke Realty or to sell the property, but there is no evidence that Coral Reef engaged in or initiated any such activities or that it could have obtained a refinancing or sale in a net amount sufficient to pay off the existing loan.
It is undisputed that in October 2007, Duke Realty sent (and Coral Reef and the guarantors received) a written default notice regarding the loan. That notice was squarely inconsistent with any belief that the purchase option would be exercised by Duke Realty in two months. Coral Reef alleges, however, that representatives of Duke Realty "represented to Coral Reef that [the default notice] was a mere formality required by its loan committee and that, as agreed, Duke would purchase the property by December 14." Taking this allegation as well as true, this was a second alleged verbal promise to forbear from collection of the defaulted interest. Coral Reef also alleges that Duke Realty misled Coral Reef into setting up meetings with medical office and Hospital representatives as if the joint venture would be moving ahead.
On December 10, 2007, four representatives of Duke Realty prepared an internal "deal summary memorandum" that evaluated Duke Realty's alternatives (one of which was foreclosure) regarding the defaulted loan. Four days later, Duke Realty filed its foreclosure action.
Coral Reef and the two guarantors responded with affirmative defenses and counterclaims alleging waiver, fraud, unclean hands, breach of joint venture contract, breach of fiduciary duty, promissory estoppel, unjust enrichment, and tortious interference. After pretrial discovery, Duke Realty moved for final summary judgment, which was granted. This appeal followed.

Analysis
A promise that any agreement waiving or modifying loan terms is to be in writing ordinarily is no less entitled to be enforced than a promise to make a payment by a certain date. In Florida,[3] oral *902 modifications are permitted despite such provisions, however, when one party provides additional consideration for the modification accepted by the other party. Davidpur v. Counne, 972 So.2d 891 (Fla. 3d DCA 2007); St. Joe Corp. v. McIver, 875 So.2d 375, 382 (Fla.2004).
In this case, Coral Reef provided no such consideration for the alleged modification of the loan documents. Continued effort to rezone the property, or to find tenants, was part of Coral Reef's original obligation, not an additional consideration. The alleged "agreement" not to refinance or sell does not represent additional consideration, as (a) there is no evidence whatsoever that Coral Reef ever attempted to refinance or sell the property, much less that it could have done so,[4] and (b) any notion that Duke Realty had "firmly committed" to exercise the purchase option in December could hardly have been relied upon after the undisputed receipt of a written default notice two months before the date the option was to expire.
Turning next to Coral Reef's affirmative defenses and counterclaims based on estoppel and fraud, the critical legal shortcoming is the element of justifiable reliance. In this case, Coral Reef and the guarantors could not, as a matter of law, justifiably rely on an alleged verbal "commitment" to exercise the purchase option in the future because they had expressly agreed not to do so. Written exercise provisions avoid misunderstandings and swearing contests. In the case of business organizations, such notices identify the position and name of the individual purporting to exercise the option on behalf of the optionee. A signed written notice from such an entity provides greater assurance that the signator has assured herself or himself that the action has been duly authorized within the entity's governance system.
Promissory estoppel, the next legal basis relied upon by the appellants, is an equitable doctrine for the enforcement of agreements, not a device to nullify an expressly-agreed, written contractual term. Advanced Mktg. Sys. Corp. v. ZK Yacht Sales, 830 So.2d 924, 928 (Fla. 4th DCA 2002); Univ. of Miami v. Intuitive Surgical, Inc., 166 Fed.Appx. 450, 454 (11th Cir.2006) ("Promissory estoppel is not available as a remedy when parties have a written contract addressing the relevant issue"). In this case, the alleged telephonic notice of exercise of Duke Realty's option is directly contrary to the written provisions of the contracts.
But the trial court's correct application of the plain language of the parties' agreements is not the only basis for finding the counterclaims legally insufficient. *903 Section 687.0304, Florida Statutes (2007), requires that a borrower may not take legal action on "an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extend credit, or to make any other financial accommodation" unless "the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." Coral Reef alleges in substance that Duke Realty agreed to forbear repayment,[5] and to make financial accommodations to Coral Reef, in a phone call. Coral Reef conceded throughout that it had no written agreement expressing consideration, setting forth the terms allegedly modified, and signed by the parties. Coral Reef's claim is thus also legally insufficient under what has been called "Florida's Banking Statute of Frauds," section 687.0304. Univ. Creek Assocs., II, Ltd. v. Boston Am. Fin. Group, Inc., 100 F.Supp.2d 1345 (S.D.Fla.2000).
Nor could the telephone call or Duke Realty's conduct overcome the express written agreement (section 9.18 of the mortgage) between the parties that their relationship was not a joint venture. Having an enforceable legal right to become a joint venturer (upon the delivery of a specified written notice) is not the same as being one through implication. And becoming a joint venturer through implication was expressly disavowed in writing by the parties from the inception of their agreements.[6]
Finally, we address the counterclaim for tortious interference. As a lender that advanced $10,000,000 and invested significant managerial time in the investment, Duke Realty had every right to attend zoning hearings, review plans, consider cost estimates, and meet prospective lessees. Taking all such allegations as true, they do not establish a legally sufficient cause of action for tortious interference. See Ferris v. S. Fla. Stadium Corp., 926 So.2d 399, 401 (Fla. 3d DCA 2006).

Conclusion
The world of commercial real estate is not a warm and fuzzy place. That is why parties to substantial transactions consult counsel and prepare highly-detailed written agreements to address every contingency the parties and their counsel can imagine. "Get it in writing" is the watchword, for better or worse. In this case, the borrowers admitted default in writing and hoped for mercy. Having signed over 100 pages of single-spaced legal documents reviewed by their attorneys, Coral Reef's principals could not ignore the requirements of those documents and section 687.0304. Any assumption that a telephone call could commit Duke Realty to close a $12,000,000 purchase (following Coral Reef's conceded payment default) fails, as the trial court correctly determined based on the record here, as a matter of law.
Affirmed.
SCHWARTZ, Senior Judge, concurs.
*904 COPE, J. (dissenting).
Disputed issues of material fact remain on the issue of promissory estoppel. The majority opinion is in error in saying that the lender statute of frauds bars the borrowers' promissory estoppel claim. The issue in this case involves part two of a three part agreement and not, as the majority opinion states, part one of that agreement.

THE THREE-IN-ONE AGREEMENT
The borrower in this case was a local land development company, Coral Reef Drive Land Development, LLC, which obtained a $10 million loan from a national company, Duke Realty Limited Partnership. The purpose of the loan was to buy real estate adjacent to the new Jackson South Memorial Hospital. The idea was to build medical offices on the property.
The parties' agreement had three major components. They were:
(1) $10 Million Loan to Coral Reef. On December 15, 2005, Duke lent Coral Reef $10 million to purchase the property. The property needed to be rezoned to allow the medical office use. Coral Reef was to obtain the rezoning at its own expense. Duke's appraisal showed the market value of the property as being $16.8 million in its current condition; $25.6 million if rezoned; and $28.3 million if a certain right-of-way could be vacated. Coral Reef was to pay interest on the loan, and was to repay the principal by December 14, 2007.
(2) Duke's Option to Buy the Property. Unlike a normal lending transaction, the parties' contract gave Duke the right to buy the real estate from Coral Reef for $11.5 million plus certain other adjustments. Duke could exercise this option during the two-year period of the parties' agreement.
There were two important features of the option:
Coral Reef could sell or refinance. The contract allowed Coral Reef to sell the property or refinance the loan at any time.
Reimbursement of Coral Reef. If Duke exercised its option to buy the property for $11.5 million, then Duke would be required to reimburse Coral Reef for all loan interest, both accrued and paid.[7]
(3) Coral Reef's Option to Require Joint Venture. The parties' agreement provided that if Duke bought the property, Coral Reef could require that the property be purchased by a joint venture consisting of Duke and Coral Reef. In that joint venture, Duke would have a seventy-five percent interest and Coral Reef would have twenty-five percent interest.

THE EVENTS RELEVANT TO PROMISSORY ESTOPPEL
Coral Reef purchased the real estate and began the rezoning process. This proved to be time-consuming and expensive. Coral Reef made one interest payment of $300,000. Coral Reef encountered financial difficulties and thereafter made no further interest payments.
Although Coral Reef was in default on the payment of interest, Duke did not declare a default. Instead, Duke stayed in close touch with Coral Reef, consulting with Coral Reef about the progress of the *905 project. Duke also independently monitored the project through local agents it retained. The contract documents contained an anti-waiver provision, so the fact that Duke declined to declare a default immediately did not bar Duke from declaring a default at a later time.
In April 2007, Coral Reef opened discussions with Duke about restructuring the mortgage or coming to some other agreement about the past-due interest. In May 2007, Coral Reef was successful in obtaining rezoning of Phase I of the project. As stated previously, the property became more valuable when this rezoning was accomplished.
We now come to the heart of the matter. On May 17, 2007, Coral Reef spoke to Duke's representative and told him that unless Duke firmly committed to exercise its option to buy the property by December 14, 2007 (the loan maturity date), Coral Reef was going to refinance the loan with another lender or sell the property and pay off the loan.
According to Coral Reef's testimony, the Duke representative unequivocally committed that Duke would exercise the option to buy the property by the December 14 deadline in return for Coral Reef's agreement not to refinance or sell the property.
Duke acknowledges all of this, except for one key difference. According to the Duke representative (as stated in an internal email to his boss), the Duke representative said, "I told him I believe we will stay in the deal." (Emphasis added). Thus, by Duke's account, Duke simply told Coral Reef what it probably would do, but did not give Coral Reef an unequivocal commitment. The Duke representative's email also said, "If we don't buy it, they have to find someone pretty quickly ... I can't imagine not buying this dirt."
Because the trial court granted a summary judgment in this case, we must read the factual record in the light most favorable to Coral Reef, as the non-moving party. See Markowitz v. Helen Homes of Kendall Corp., Inc., 826 So.2d 256, 258-59 (Fla.2002). It follows, for purposes of this appeal, that we accept Coral Reef's testimony: Duke's representative gave an unequivocal assurance to Coral Reef that Duke would exercise its option and purchase the property by December 14, 2007, in exchange for which Coral Reef refrained from selling the property or refinancing the loan.
Both sides agree that in the next several months Coral Reef and Duke were in constant communication regarding the details of the development project. Duke made a number of suggestions regarding how the project should proceed.
On October 17, 2007, Duke sent Coral Reef a default notice, stating that it was accelerating the loan. Coral Reef states that the Duke representative said this default notice was a mere formality required by its loan committee and that, as agreed, Duke would exercise the option by December 14, 2007.
According to documents produced in discovery, executives within Duke directed a Duke analyst to prepare a financial analysis entitled "Foreclosure vs. Option." The purpose was to determine whether it would be more profitable for Duke to foreclose on the property rather than exercising the option to buy. The study concluded that it would be more profitable to foreclose.
On December 14, 2007, Duke filed a foreclosure suit. Once the title to the property was clouded by the foreclosure suit, Jackson South Hospital declined to enter into a written space commitment for the buildings that were to be constructed. Given the uncertainty created by the foreclosure *906 suit, Coral Reef was unable to sell the property or obtain alternative financing.
In the foreclosure suit, Coral Reef filed counterclaims. The counterclaim relevant here is Coral Reef's claim for promissory estoppel. The trial court entered summary judgment in favor of Duke on the foreclosure claim and the counterclaims. Coral Reef has appealed.

PROMISSORY ESTOPPEL
Florida recognizes the cause of action for promissory estoppel. The Florida Supreme Court has explained:
The basic elements of promissory estoppel are set forth in Restatement (Second) of Contracts § 90 (1979), which states:
(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.
W.R. Grace & Co. v. Geodata Servs., Inc., 547 So.2d 919, 924 (Fla.1989).[8]
The facts of this case make out a viable claim for promissory estoppel. In May 2007, Coral Reef had seven months remaining before the $10 million loan came due. There was ample equity in the property, the value of which had increased after the rezoning was accomplished. Based on its close working relationship with Duke, Coral Reef also believed that Duke was interested in exercising the option to buy the real estate.
On May 17, 2007, Coral Reef spoke with Duke's representative and advised him that unless Duke firmly committed to exercise its option by the December 14, 2007 loan maturity date, Coral Reef was going to refinance the loan or sell the property and, under either alternative, pay Duke in full. The parties appear to agree that under such a scenario, Duke would lose its option to buy the property.
According to Coral Reef, Duke's representative unequivocally committed that Duke would exercise its option by the December 14 deadline and in reliance on that promise, Coral Reef did not seek an alternative lender or sell the property. Duke foreclosed instead of exercising the option, and Coral Reef lost the property.
These facts state a claim for promissory estoppel. Promissory estoppel exists where a promisorDuke in this case makes "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee." Restatement (Second) of Contracts § 90. The Duke representative knew that the promise (to exercise the option) would induce forbearance by Coral Reef because Coral Reef said so. Coral Reef told Duke that they would sell or refinance unless Duke made the unequivocal commitment to exercise the option.
For promissory estoppel to exist, Duke's promise must also induce the action or for forbearance. Id. It did. Coral Reef continued its work on the project and neither sold nor refinanced. Finally, promissory estoppel applies "if injustice can be avoided only by enforcement of the promise." Id. Under the facts of this case, that element is also satisfied. The summary judgment should be reversed and the cause *907 remanded for further proceedings on that issue.
Duke argues that promissory estoppel cannot be invoked when the parties have a written contract. That is not so. Estoppel prevents a person from contradicting "a representation of fact made by him after another has relied on the representation." Restatement (Second) of Contracts § 90 comment a. Several of the Restatement examples involve promises made in connection with a written contract. See, e.g., id. comment b illus. 2 (borrower's detrimental reliance where lender promised not to foreclose for a specified time), comment c illus. 5 (new lender reasonably relied on original lender's promise to release part of the land from the mortgage upon payment of a stated sum).
Duke's more substantial argument is that promissory estoppel cannot be employed where a promise is barred by the bank statute of frauds, which is section 687.0304, Florida Statutes (2005). As already stated, the doctrine of promissory estoppel is unavailable if the promise is barred by the statute of frauds. W.R. Grace & Co., 547 So.2d at 920, 925.
The bank statute of frauds requires credit agreements to be in writing. A credit agreement includes "an agreement to lend or forbear repayment of money, goods, or things in action, to otherwise extent credit, or to make any other financial accommodation." § 687.0304(1)(a), Fla. Stat. A creditor is a person who extends credit under a credit agreement with a debtor, while a debtor is a person who obtains such credit.
The bank statute of frauds is not applicable here. As already explained, this transaction had three parts: (1) the loan; (2) the option for Duke to buy the real estate; and (3) the option for Coral Reef to require the formation of a joint venture. The issue here is transaction (2)the option to buy the real estatenot transaction (1)the loan.
This is not a case in which there was an outstanding loan and the borrower asked the lender to forbear the collection of interest. Under such facts, the bank statute of frauds would apply and the agreement would have to be in writing.
Here, however, the issue is the option for Duke to buy the real estate. Coral Reef's specific request was for a firm commitment from Duke that it would exercise the option by December 14, 2007, failing which Coral Reef would sell the property or refinance the loan. When Coral Reef gave that assurance, it was Coral Reef who engaged in forbearanceforbearance from selling the property or refinancing the loan.
Duke argues, however, that this transaction falls within the bank statute of frauds because this amounted to Duke's agreement to allow Coral Reef to forbear from repayment of interest, or amounts to "any other financial accommodation" for purposes of the statute.
Duke's argument is incorrect under the circumstances of this case. The option for Duke to buy the real estate already existed and was not created as an "accommodation" for Coral Reef. All Coral Reef wanted was a firm commitment regarding exercise of the option.
Regarding the repayment of interest, the option agreement establishes that the purchase price for Duke to acquire the property was $11.5 million plus reimbursement of costs actually expended by Coral Reef to rezone the property. Of particular interest here, Duke was also required to reimburse Coral Reef for "all interest that has accrued on the Loan (irrespective of whether such interest has been paid by Borrower or has accrued under the *908 Loan and remains unpaid)." R. 252 (emphasis added).
In other words, the option itself contemplated the possibility that Coral Reef might not have paid the interest due on the loan. Regardless of whether the interest was paid or unpaid, if the option was exercised, the accrued but unpaid interest was to be an adjustment to the purchase price. As Coral Reef has correctly argued, under the terms of the option agreement, overdue interest is accounted for at the closing by making the appropriate financial adjustment. Under the circumstances present here, the bank statute of frauds does not apply.
The majority opinion says that there was no consideration for Duke's unequivocal commitment to Coral Reef that it would exercise the option. That is incorrect. Forbearance counts as consideration for such a promise. This court has said:
It is well recognized that forbearance to enforce a legal right may constitute consideration for a promise. It is not required that the forbearance be provided for in express language or terms. This is so because a request by the promisor or undertaking by the promisee to forbear may be implied from conduct of the parties and the nature of the transaction. Consideration is supplied when the circumstances are such that it is reasonable to infer that forbearance was desired and sought by the promisor and forbearance by the promisee follows.
Boymer v. Birmelin, 227 So.2d 358, 362 (Fla. 3d DCA 1969).
The majority opinion says that "there is no evidence whatsoever that Coral Reef ever attempted to refinance or sell the property, much less that it could have done so ...." majority op. at 902. Respectfully, that assertion does not read the record in the required light. Coral Reef's entire point here is that it told Duke that Coral Reef would sell or refinance unless Duke gave a firm commitment that it would exercise the option. Duke gave that assurance. Coral Reef refrained from refinancing or selling the property.
Duke did not make an argument in its motion for summary judgment that it would have been impossible for Coral Reef to refinance or sell the property. This court cannot consider an alternative ground for affirmance unless there has been a fair opportunity for that issue to be developed in the record. Robertson v. State, 829 So.2d 901 (Fla.2002); Dade County Sch. Bd. v. Radio Station WQBA, 731 So.2d 638 (Fla.1999).
To the extent that the present record addresses this issue, the record indicates that in 2007, a sale or refinancing was feasible. The loan amount here was $10 million on land that at the outset was worth $16.9 million, and after rezoning was worth more. Duke continued to verify the land value as the transaction unfolded. According to an email sent by Duke's representative, "This site is zoned, in one of the fastest growing parts of the country, adjacent to a ... hospital that is doubling in size and is out of land." For that reason Duke's representative said, as previously quoted, "I can't imagine not buying this dirt."
The majority opinion states that "any notion that Duke Realty had `firmly committed' to exercise the purchase option in December could hardly have been relied upon after the undisputed receipt of a written default notice two months before the date the option was to expire." Majority op. at 902. Again, this assertion reads the record in the wrong light. According to Coral Reef's testimony, they were assured by the Duke representative that this *909 was a meaningless formality and that Coral Reef should pay no attention to it.
In conclusion, we should reverse the summary judgment on the issue of promissory estoppel and remand the cause for further proceedings.[9]
NOTES
[1] The judgments were also entered against the individual appellants, Douglas Landsea and Robert Shelley, as guarantors.
[2] These written statements are equivocal expressions of a then-current belief, not confirmation of an actual exercise of an option or a statement that Duke Realty would exercise the purchase option seven months later. Nonetheless, for purposes of review we assume that Landsea's account of his telephone conversation with Dunbar is true.
[3] Our Supreme Court or legislature may some day recede from this outdated common law concept. In the Uniform Commercial Code governing sales, in Florida as in all other states, a written agreement that says it can only be modified in a signed writing can only be modified in a signed writing. See § 672.209, Fla. Stat. (2009). The rule has been extended to other contracts as well by statute in a number of states. The United States Court of Appeals for the District of Columbia Circuit has succinctly explained why the UCC rule is the better one:

The drawback of the common law rule is that it denies to all contracting parties, no matter how sophisticated, the ability to decide for themselves whether to restrict the manner in which their agreement may be modified. The UCC rule, on the other hand, enables those parties who mutually value certainty in their relations to have it; under the UCC rule, moreover, no one has to agree to rule out oral modifications nor, having so agreed, are the parties precluded from executing a mutually agreeable modification.
Martinsville Nylon Employees Council Corp. v. NLRB, 969 F.2d 1263, 1267 (D.C.Cir.1992).
[4] The option provision expressly stated that the option was irrevocable during its term. A hypothetical transaction to refinance the Duke Realty loan and mortgage, or to sell the property, during that term would not terminate the option or assure greater profit for Coral Reef.
[5] The appellants testified that the significance of the alleged "firm commitment" to exercise the purchase option was that the defaulted interest would be credited, and thereby forgiven, at the closing. The "firm commitment" is thus both an alleged agreement to forbear repayment of the interest and a "financial accommodation" in the form of an agreement to pay off the loan for Coral Reef despite the existence of the default.
[6] The legally-insufficient claims that a joint venture was formed will not support Coral Reef's counterclaim for breach of a resulting fiduciary duty. As a creditor and debtor with no special relationship of trust and confidence to the other, neither Duke Realty nor Coral Reef assumed a fiduciary duty to the other. Watkins v. NCNB Nat'l Bank of Fla., Inc., 622 So.2d 1063, 1065 (Fla. 3d DCA 1993).
[7] It appears that the reimbursement of interest was inserted in order to be sure that Duke's loan did not violate the Florida usury law. See § 687.03, Fla. Stat. (2005). The property was appraised as being worth several million dollars more than the $10 million loan amount. If Duke exercised the option and if the excess value were to be characterized as interest, the loan would violate the usury statute and be unenforceable. For that reason the loan was to be unwound if and when the option was exercised.
[8] The doctrine is not available where the claim would be barred by the statute of frauds. Id. at 920, 925; Tanenbaum v. Biscayne Osteopathic Hosp., Inc., 190 So.2d 777, 779 (1966).
[9] The majority opinion states that if Coral Reef refinanced, or sold the property, such a transaction would not terminate Duke's option. Majority op. at 902 n. 4. So far as I can determine, Duke did not make that argument in its motion for summary judgment or this appeal. Accordingly, Coral Reef has had no opportunity to respond to that argument. In any event, even if the majority opinion is correct, it does not establish that Coral Reef would have been unable to refinance or sell this property, subject to the Duke option.